**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: US Airways Group,
Incorporated,

*Debtor.*

The Retired Pilots Association of
US Airways, Incorporated
(Soaring Eagles),

        *Plaintiff-Appellant,*

v.

US Airways Group, Incorporated,

        *Debtor-Appellee.*

No. 03-1825

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-03-413-A; BK-02-83984-SSM)

Argued: February 26, 2004

Decided: May 27, 2004

Before WILKINSON and KING, Circuit Judges,
and William D. QUARLES, Jr., United States District Judge for the
District of Maryland, sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the opinion,
in which Judge King and Judge Quarles joined.

**COUNSEL**

**ARGUED:** Jeffrey Gans, THELAN, REID & PRIEST, L.L.P., Washington, D.C., for Appellant. Edward Joseph Meehan, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, L.L.P., Washington, D.C., for Appellee. **ON BRIEF:** Sherwin S. Kaplan, THELAN, REID & PRIEST, L.L.P., Washington, D.C., for Appellant. John Wm. Butler, Jr., John K. Lyons, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, L.L.P., Chicago, Illinois; Alesia Ranney-Marinelli, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, L.L.P., New York, New York; E. Duncan Getchell, Jr., MCGUIREWOODS, L.L.P., Richmond, Virginia; Lawrence E. Rifken, Douglas M. Foley, MCGUIREWOODS, L.L.P., McLean, Virginia; Janet L. Dhillon, Alexander W. Powell, Jr., SKADDEN, ARPS, SLATE, MEAGHER & FLOM, L.L.P., Washington, D.C., for Appellee.

**OPINION**

WILKINSON, Circuit Judge:

During the course of its bankruptcy reorganization, appellee US Airways Group, Inc. moved the bankruptcy court for permission to terminate a pension plan it maintained for its pilots. Appellant Retired Pilots Association of US Airways, Inc. opposed the motion. The bankruptcy court found that US Airways had demonstrated that it could not succeed in its reorganization efforts without terminating the pension plan. The bankruptcy court therefore issued an order allowing US Airways to effect a distress termination of the pension plan and to replace it with a new pension plan that would cover only active and other non-retired pilots.

Appellant did not seek a stay of this order, and it did not object to the subsequent implementation of US Airways' reorganization plan. As a result, by the time appellant's challenge to the bankruptcy court's termination order reached the district court, the termination order had been fully consummated and the company's reorganization plan had been confirmed and substantially implemented. The district court therefore dismissed the appeal as equitably moot. Because

reversal of the bankruptcy court's termination order at this late stage would undermine the reorganization plan and the interests of third parties relying upon the plan, we affirm.

I.

US Airways filed a voluntary petition for Chapter 11 reorganization on August 11, 2002. US Airways needed a fast-track reorganization so that, among other reasons, it would not lose the services of its credit card processing company. It therefore chose March 31, 2003 as its target date to emerge from bankruptcy. In order to continue its operations while in bankruptcy, US Airways secured a $500 million debtor-in-possession loan from The Retirement Systems of Alabama Holdings, LLC ("RSA"). To support its post-emergence operations, the company obtained commitments from RSA, the Air Transportation Stabilization Board ("ATSB"), and Bank of America for $1 billion in exit financing and $240 million of equity investment. In order to receive these loans, however, US Airways had to meet certain financial projections.

The particular issue that threatened US Airways' ability to access the loans was an escalating pension plan funding problem. Between June 2002 and November 2002, US Airways' projected contribution requirements for all of its defined benefit pension plans had increased from $2.5 billion to $3.6 billion because of lower interest rates and poor performance by the stock market. At the same time, the company's projected income had declined considerably, in part because of declines in passenger revenues in the entire airline industry after the terrorist attacks of September 11th.

To remedy this problem, US Airways revised its business plan. Among the changes it made, the company projected reduced contributions of $850 million to the Retirement Income Plan for Pilots of US Airways, Inc. That pension plan, which is at the center of this appeal, was an underfunded plan guaranteed by the Pension Benefit Guaranty Corporation ("PBGC"). The ATSB approved the revised business plan, but it expressly conditioned its approval on US Airways resolving the pension funding problem.

US Airways therefore explored a variety of ways to meet the projected contributions of $850 million to the pension plan. In conjunc-

tion with the Air Line Pilots Association ("ALPA"), US Airways considered reducing costs, freezing the benefits under the pension plan, or freezing the benefits under all of US Airways' pension plans. None of these options, however, proved sufficient to meet the $850 million contribution level. Moreover, US Airways' attempts to obtain administrative and legislative assistance failed. First, the IRS rejected a joint proposal by US Airways and ALPA to receive a special funding waiver that would alleviate the pension funding requirements. Second, the PBGC rejected a joint proposal for restoration funding, which would have permitted US Airways to pay its plan liabilities over a longer period of time. Finally, Congress rejected legislation proposed on behalf of US Airways and ALPA to reduce the annual funding required for the pension plan to an affordable level.

Having failed in these efforts to meet the $850 million contribution level, US Airways filed a notice of intent to terminate the pension plan on January 30, 2003. *See* 29 U.S.C. § 1341(c)(1)(A). Under the Employee Retirement Income Security Act (ERISA), US Airways could effect such a "distress termination" only upon the bankruptcy court's finding that, "unless the [pension] plan is terminated, [US Airways] will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process." *Id.* § 1341(c)(2)(B)(ii)(IV). Appellant, in addition to ALPA and other pilot groups, opposed US Airways' motion. ALPA also filed a grievance, alleging that a distress termination would violate the terms of US Airways' collective bargaining agreement with its active pilots.

On March 2, 2003, the bankruptcy court entered an order finding that US Airways had demonstrated the financial requirements necessary for a distress termination. The court therefore permitted US Airways to terminate the pension plan, subject to a determination that doing so would not violate the collective bargaining agreement. US Airways then resolved the collective bargaining agreement issue on March 21, 2003, when it reached an agreement with ALPA to terminate the pension plan effective on March 31 and to replace it with a new pension plan for its active and other non-retired pilots. Retired pilots, not covered by the new pension plan, would be entitled only to the reduced benefits guaranteed by the PBGC under the old pension plan. Appellant filed a notice of appeal of the bankruptcy court's

termination order on March 6, 2003, but it did not move for a stay of that order, and neither did it challenge or request a stay of US Airways' proposed reorganization plan.

Then, on March 18, 2003, the bankruptcy court issued a confirmation order approving US Airways' reorganization plan. US Airways subsequently obtained approval from ALPA, the PBGC, and the bankruptcy court to terminate the pension plan and to put the new pension plan for active and non-retired pilots in its place. On March 28, the PBGC executed the termination of the pension plan and assumed the plan's liabilities. US Airways successfully emerged from Chapter 11 bankruptcy on March 31 and received the $1.24 billion in exit financing and equity investment as a result of meeting its financial projections. Since that time, US Airways has continued its business operations and has entered into hundreds of transactions with third parties.

Appellant, however, continued with its appeal of the bankruptcy court's termination order, though it had not objected to US Airways' plan of reorganization or to the confirmation order. Appellant argued that US Airways could have met its financial projections and could have reorganized itself without immediately terminating the pension plan. Rather than addressing the merits of appellant's challenge, the district court dismissed the appeal as equitably moot. It found that granting the relief sought by appellant — reversing the distress termination order and requiring US Airways to restore the pension plan — would endanger the reorganization plan and would harm third parties that had relied upon the reorganization plan. Appellant now contests that decision.

## II.

The doctrine of equitable mootness represents a pragmatic recognition by courts that reviewing a judgment may, after time has passed and the judgment has been implemented, prove "impractical, imprudent, and therefore inequitable." *MAC Panel Co. v. Va. Panel Corp.*, 283 F.3d 622, 625 (4th Cir. 2002); *see also Cent. States, SE and SW Areas Pension Fund v. Cent. Transp., Inc.*, 841 F.2d 92, 93, 95-96 (4th Cir. 1988). Within the context of a bankruptcy proceeding, a court may dismiss an appeal as equitably moot "when it becomes

impractical and imprudent to upset the plan of reorganization at this late date." *MAC Panel*, 283 F.3d at 625 (internal quotation and citation omitted). We have identified certain factors that aid the determination of whether the requested relief can, as a practical matter, be granted:

> (1) whether the appellant sought and obtained a stay; (2) whether the reorganization plan or other equitable relief ordered has been substantially consummated; (3) the extent to which the relief requested on appeal would affect the success of the reorganization plan or other equitable relief granted; and (4) the extent to which the relief requested on appeal would affect the interests of third parties.

*Id.* As the district court found, these factors weigh in favor of dismissing this appeal as equitably moot.*

First, it is significant that appellant never sought to obtain a stay of any kind. Appellant never attempted to stay the bankruptcy court's distress termination order, nor did it attempt to expedite its appeal of that order. Appellant also did not attempt either to stay the confirmation order or to prevent implementation of the reorganization plan. Instead, appellant sat idly by as US Airways executed the termination order and implemented its reorganization plan by completing hundreds of transactions with third parties. To this day, appellant has offered no explanation for its failure to defer implementation of the termination order or the reorganization plan by seeking a stay. This factor therefore weighs strongly in favor of a finding of equitable mootness.

Moreover, it is undisputed that the termination order and the confirmation order have been fully consummated. The bankruptcy court's termination order was fully consummated on March 21 when US Airways resolved the collective bargaining agreement dispute with ALPA. And once the pension plan was terminated, the confirmation

---

*The parties disagree as to whether we should review the district court's finding of equitable mootness de novo, or for an abuse of discretion. We need not resolve that question here, however, because under either standard we would affirm the district court.

order was fully consummated because US Airways had satisfied the last condition to meeting its financial projections and became able to access the $1.24 billion in exit financing and equity investment. This second factor thus also weighs heavily in favor of adjudging the appeal equitably moot.

Finally, we cannot see how the requested relief — reversal of the termination order — could be granted without undoing US Airways' reorganization plan and without adversely impacting the interests of third parties who have relied upon the consummated confirmation order. Most obviously, reinstating the large unfunded pension liability on US Airways at this stage would undermine the conditions that the company's lenders placed upon their loans. In order to gain confirmation of its reorganization plan and to obtain pre- and post-emergence financing from the ATSB, RSA, and Bank of America, US Airways had to meet certain financial projections. The bankruptcy court determined that US Airways would have been unable to meet these projections without terminating the pension plan. As a result, the company would have been unable to emerge from bankruptcy and continue its business operations. By granting appellant's requested relief and thereby re-imposing the pension funding problem at this late stage, we would directly undermine the interests of those lenders that expressly conditioned their loans on resolution of this issue.

In addition to the lenders' reliance interests, there are a number of other third parties that have engaged in transactions with US Airways since the company's emergence from bankruptcy. For example, US Airways has contracted with Bank of America to process the company's credit card transactions; cancelled all of its prior common stock and distributed new restricted stock; and entered into restructuring agreements and collective bargaining agreements with its unions. Moreover, pursuant to the reorganization plan, US Airways has paid millions of dollars worth of administrative claims; it has cured pre-petition defaults on thousands of executory contracts and unexpired leases and has continued to perform under those contracts and leases as modified during reorganization; and it has begun the process of resolving other secured claims. In short, US Airways has substantially implemented its reorganization plan. The third parties that engaged in these transactions with US Airways undoubtedly relied upon the confirmation and success of the reorganization plan, and thus did not

account for the risks involved if we were to reinstate the massive pension liability on US Airways.

Simply put, if we granted appellant's requested relief at this juncture we would jeopardize all of the progress US Airways has made, both while in Chapter 11 and since emerging from bankruptcy. And apart from the damage inflicted on this massive reorganization plan, we would shake the reliance that businesses, investors, and the public place on the finality of bankruptcy confirmation orders. *See In re Cont'l Airlines*, 91 F.3d 553, 565 (3d Cir. 1996). In short, we would render substantially more difficult the successful completion of large reorganization efforts such as the present one. *See id.*

Appellant stresses, however, that the bankruptcy court and US Airways' creditors required only *some* resolution of the pension funding issue, and they did not require specifically that the pension plan be *terminated*. Thus, appellant argues, termination of the pension plan was not absolutely necessary to formulating a workable reorganization plan. And if the bankruptcy court can now formulate a workable reorganization plan in which the pension plan is reinstated, then, appellant contends, such relief would not harm the reorganization plan or third parties relying upon it.

This argument misses the mark. First, we note that US Airways explored a variety of solutions to the pension funding issue, but ultimately it concluded (and the bankruptcy court agreed) that a distress termination was the only viable option. But even assuming that appellant is correct and that an alternative solution could be devised, such an alteration at this stage would still affect the current structure of the reorganization plan. By reversing the termination order, we would essentially "un-satisfy" a necessary condition to US Airways' confirmation order and its entitlement to $1.24 billion in equity investment and exit loans. To resolve the problems this would create, other parts of the plan would have to be reconfigured: approval by US Airways' lenders and the bankruptcy court would have to be obtained, distributions under the plan would have to be reworked, and a variety of completed transactions and banking arrangements would have to be undone. As the district court observed, revisiting the issue at this point would be wholly impractical.

### III.

We therefore conclude that appellants' challenge to the bankruptcy court's distress termination order is equitably moot. We are not indifferent to the fact that any alteration in pension payments and obligations is not a matter to be taken lightly in the bankruptcy process. While Congress has provided under ERISA a process for the distress termination of pension funding obligations, we are well aware that such a step is envisioned only as a matter of business necessity and survival. The bankruptcy court was careful in this case to ensure that the statutory conditions for a distress termination were met. What is done cannot now be undone. It is simply too late in the day to unwind the intricate series of transactions that has occurred in the reorganization process in order to grant the requested relief and revive the pension plan. The judgment of the district court is hereby

*AFFIRMED.*