PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 14-3332 & 14-3333
_____


IN RE:  TRIBUNE MEDIA COMPANY
f/k/a Tribune Company,
f/k/a Times Mirror Corporation, et al.,
Debtor

AURELIUS CAPITAL MANAGEMENT, L.P.,
Appellant (14-3332)

DEUTSCHE BANK TRUST COMPANY AMERICAS;
LAW DEBENTURE TRUST COMPANY OF NEW YORK,
Appellant (14-3333)

_____


Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action Nos. 1-12-cv-00128/mc-00108/cv-
01072/3/01100/01106)
District Judge: Honorable Gregory M. Sleet
_____


Argued April 15, 2015

Before: AMBRO, VANASKIE,
and SHWARTZ, <u>Circuit Judges</u>

(Opinion filed:  August 19, 2015 )

Roy T. Englert, Jr., Esquire   (Argued)
Matthew M. Madden, Esquire
Hannah W. Riedel, Esquire
Mark T. Stancil, Esquire
Robbins, Russell, Englert, Orseck, Untereiner & Sauber
1801 K Street, N.W., Suite 411-L
Washington, DC   20006

      Counsel for Appellants
      Aurelius Capital Management, L.P.
      Law Debenture Trust Company of New York

David J. Adler, Esquire
McCarter & English
245 Park Avenue, 27th Floor
New York, NY   10167

Katharine L. Mayer, Esquire
McCarter & English
405 North King Street
Renaissance Centre, 8th Floor
Wilmington, DE  19801

      Counsel for Appellant
      Deutsche Bank Trust Company Americas

James F. Bendernagel, Jr., Esquire
Sidley Austin

1501 K Street, N.W.
Washington, DC   20005

James O. Johnston, Esquire   (Argued)
Jones Day
555 South Flower Street, 50th Floor
Los Angeles, CA   90071

Candice L. Kline, Esquire
Jeffrey C. Steen, Esquire
Sidley Austin
One South Dearborn Street
Chicago, IL   60603

J. Kate Stickles, Esquire
Cole Schotz
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801

      Counsel for Appellees
      Tribune Media Company

―――――――――

OPINION  OF  THE  COURT
―――――――――

AMBRO, <u>Circuit Judge</u>

Aurelius Capital Management, L.P. ("Aurelius"), along with the Law Debenture Trust Company of New York and Deutsche Bank Trust Company Americas (the "Trustees"), appeal the District Court's dismissal as equitably moot of their appeals from the Bankruptcy Court's order

3

confirming Tribune's Chapter 11 plan of reorganization. We agree with the District Court that Aurelius's appeal, which seeks to undo the crucial component of the now consummated plan, should be deemed moot. However, we reverse and remand with respect to the Trustees. They seek disgorgement from other creditors of $30 million that the Trustees believe they are contractually entitled to receive. As the relief the Trustees request would neither jeopardize the $7.5 billion plan of reorganization nor harm third parties who have justifiably relied on plan confirmation, their appeal is not equitably moot.

## I. Facts and Procedural History

In December 2007, the Tribune Company (which published the *Chicago Tribune* and the *Los Angeles Times* and held many other properties) was facing a challenging business climate. Sensing an opportunity, Sam Zell, a wealthy real estate investor, orchestrated a leveraged buy-out ("LBO"), a transaction by which a purchaser (in this case, an entity controlled by Zell and, for convenience, referred to by that name in this opinion) acquires an entity using debt secured by assets of the acquired entity. Before the LBO, Tribune had a market capitalization of approximately $8 billion and about $5 billion in debt.

The LBO was taken in two steps: Zell made a tender offer to obtain more than half of Tribune's shares at Step One, followed by a purchase of all remaining shares at Step Two. In this LBO, as is typical, Zell obtained financing (called here the "LBO debt") to purchase Tribune secured by Tribune's assets, meaning that Zell had nothing at risk. The transaction took Tribune private and saddled the company with an additional $8 billion of debt. Moreover, as a part of the sale, Tribune's subsidiaries guaranteed the LBO debt. The holders of the debt that Tribune carried before Zell took

4

it over (the "pre-LBO debt") had recourse only against Tribune, not against the subsidiaries. Thus the LBO debt, guaranteed by solvent subsidiaries, had "structural seniority" over the pre-LBO debt.

Unsurprisingly, Tribune, in a declining industry with a precarious balance sheet, eventually sought bankruptcy protection. It filed under Chapter 11 in December 2008, and at some later point Aurelius, a hedge fund specializing in distressed debt, bought $2 billion of the pre-LBO debt and became an active participant in the bankruptcy process. (We do not know how much Aurelius paid for this debt.)

Ten days after the filing, the U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "Committee"), which obtained permission to pursue various causes of action (*e.g.*, breach of fiduciary duty and fraudulent conveyance) on behalf of the estate against the LBO lenders, directors and officers of old Tribune, Zell, and others (collectively called the "LBO-Related Causes of Action," see *In re Tribune Co.*, 464 B.R. 126, 136 n.7 (Bankr. D. Del. 2011)[1]). As the Bankruptcy Court put it, "[f]rom the outset . . . the major constituents understood that the investigation and resolution of the LBO-Related Causes of Action would

---

[1] This is the most relevant Bankruptcy Court opinion we review, though it ultimately denied confirmation of both of the competing plans referred to below—the Noteholder Plan and the DCL Plan. The latter denial was on narrow curable grounds that the DCL Plan proponents quickly addressed, and thus much of the reasoning supporting Judge Carey's decision to confirm the plan he did is included in the opinion initially denying confirmation.

be a central issue in the formulation of a plan of reorganization." *Id.* at 142.

Various groups of stakeholders proposed plans of reorganization; the important ones for the purposes of this appeal are Aurelius's (the "Noteholder Plan") and one sponsored by the Debtor, the Committee, and certain senior lenders, called the "DCL Plan" (for Debtor/Committee/Lender) or simply the "Plan." The primary difference between the Noteholder and the DCL Plans was that the proponents of the former (the "Noteholders") wanted to litigate the LBO-Related Causes of Action while the DCL Plan proposed to settle them.

Kenneth Klee, one of the principal drafters of the Bankruptcy Code of 1978, was appointed the examiner in this case, and he valued the various causes of action to help the parties settle them. Professor Klee concluded that whether Step One left Tribune insolvent (and was thus constructively fraudulent) was a "very close call" if Step Two debt was included for the purposes of this calculation. *Id.* at 159. He further concluded that a court was "somewhat likely" to find intentional fraud and "highly likely" to find constructive fraud at Step Two. *Id.* He also valued the recoveries to Aurelius's and the Trustees' classes of debt under the various litigation scenarios and concluded that the DCL Plan settlement offered more money ($432 million) than all six possible litigation outcomes except full avoidance of the LBO transactions, which would have afforded the pre-LBO lenders $1.3 billion. *Id.* at 161. Given these findings for both steps of the LBO, full recovery was a possibility.

The DCL Plan restructured Tribune's debt, settled many of the LBO-Related Causes of Action for $369 million, and assigned other claims to a litigation trust that would continue to pursue them and pay out any proceeds according

6

to a waterfall structure whereby the pre-LBO lenders stand to receive the first $90 million and 65% of the Trust's recoveries over $110 million (this aspect of the Plan we refer to as the "Settlement"). Aurelius objected because it believes the LBO-Related Causes of Action are worth far more than the examiner or Bankruptcy Court thought and that it can get a great deal more money in litigation than it got under the Settlement. The Bankruptcy Court's opinion on confirmation, thoroughly done by Judge Kevin Carey, discussed the parties' disagreement at length and ultimately concluded that it was "uncertain" that litigation would result in full avoidance of the LBO. *Id.* at 174. And full avoidance was the only result the Bankruptcy Court's opinion suggests could plausibly result in greater recovery than the Settlement. *See id.* at 161 (citing examiner's opinion that only full avoidance could exceed settlement value); 174 (rejecting contrary expert opinions). Thus the Court held that the Settlement was reasonable, and, on July 23, 2012, the DCL Plan was confirmed over Aurelius's objection.

Aurelius promptly moved for a stay pending appeal under Bankruptcy Rule 8007. The Bankruptcy Court held a hearing on the motion at which it considered whether to issue a stay and, if so, whether to condition it on a bond. Aurelius opposed posting a bond in any amount. The Court stayed its confirmation order, but it also considered how much an unsuccessful appeal by Aurelius would cost Tribune. As a result of this valuation, the Court conditioned its stay on Aurelius's posting a $1.5 billion bond to indemnify Tribune against the estimated costs associated with staying the order for the likely time to appeal. *In re Tribune Co.*, 477 B.R. 465, 482 (Bankr. D. Del. 2012).

With the threat of equitable mootness looming, Aurelius and the Trustees filed emergency motions to vacate the bond requirement and to expedite their appeals. The

7

District Court, however, denied the motions and ordered that the briefing schedule for these appeals would be the same as for other appealing parties (who are not before us). Aurelius appealed the denial of the motions related to the bond requirement, but we dismissed the appeal for want of appellate jurisdiction (the denials were not final orders). Aurelius objected that the amount of the bond was prohibitively high, but it has never argued to any court that a lower amount would be reasonable; rather, it has consistently tried to eliminate the bond requirement altogether.

The appeals were fully briefed in the District Court on October 11, 2012, when Aurelius and the Trustees again moved to have their appeals heard separately from the other pending appeals; the District Court did not rule on this motion (which Tribune opposed). On December 5, 2012, Aurelius again moved for expedition (the Court again denied the motion), and the Plan was consummated on December 31. On January 18, 2013, Tribune moved to dismiss the appeals as equitably moot. About 18 months later, the District Court granted that motion.

As all agreed, the plan was substantially consummated, and Tribune persuaded the District Court that it could not effectively afford relief without causing undue harm either to reorganized Tribune or to its investors. Aurelius appeals, arguing that the case is not equitably moot and that the Settlement was unreasonably low. The fund seeks modification of the confirmation order to reinstate the LBO-Related Causes of Action that the Settlement resolved so that the claims can be fully litigated or re-settled.

The Trustees also appeal. They represent certain pre-LBO debt treated as "Class 1E creditors" in the Plan. They argue that they had subordination agreements with the holders of two series of pre-LBO notes Tribune issued, called the

8

PHONES Notes and the EGI Notes, worth a total of about $30 million. According to the subordination agreements, if Tribune went bankrupt, any recovery by the PHONES and EGI Notes would be payable to the Class 1E holders. However, the Plan provides that any recovery from those Notes will be distributed *pro rata* between Class 1E and Class 1F . The latter has about 700 creditors in it, the majority of whom "are individuals and small-business trade creditors." *In re Tribune Co.*, Nos. 12-cv-1072 *et al.*, 2014 WL 2797042, at *6 (D. Del. June 18, 2014). Further complicating the intercreditor dispute is that under the Plan Class 1F members were allowed to choose one of two payment options: either they could receive a lump sum at the time of their election or they could participate in the Plan's litigation trust (the latter holding out a potentially greater, but more uncertain, recovery). The Trustees contend that the Plan gives Class 1F $30 million dollars that should go to Class 1E, and they propose several ways in which Class 1E could recover that money without fatally unravelling the Plan.

We have jurisdiction under 28 U.S.C. §§ 158(d) and 1291. We review the Court's equitable mootness determination for abuse of discretion.[2]

---

[2] A panel of our Court was "inclined to agree with" then-Judge Alito's criticism, *see In re Continental Airlines*, 91 F.3d 553, 568 n.4 (3d Cir. 1996) (*en banc*) (Alito, J., dissenting), that "'this standard of review [] contradict[s] our precedent that[,] where the district court sits as an appellate court, we exercise plenary review.'" *In re SemCrude, L.P.*, 728 F.3d 314, 320 n.6 (3d Cir. 2013) (quoting *In re Phila. Newspapers, LLC*, 690 F.3d 161, 167–68 n.10 (3d Cir. 2012)). However, as was true in *SemCrude*, the abuse-of-

## II. Discussion

### *A. The Doctrine of Equitable Mootness*

"Equitable mootness" is a narrow doctrine by which an appellate court deems it prudent for practical reasons to forbear deciding an appeal when to grant the relief requested will undermine the finality and reliability of consummated plans of reorganization.[3] The party seeking to invoke the doctrine bears the burden of overcoming the strong presumption that appeals from confirmation orders of reorganization plans—even those not only approved by confirmation but implemented thereafter (called "substantial consummation" or simply "consummation")—need to be decided. *In re SemCrude, L.P.*, 728 F.3d 314, 321 (3d Cir. 2013). Unless we can readily resolve the merits of an appeal against the appealing party, our starting point is the relief an appellant specifically asks for. And even "when a court applies the doctrine of equitable mootness, it does so with a scalpel rather than an axe. To that end, a court may fashion

discretion standard of review remains the law of our Circuit. *Cont'l Airlines*, 91 F.3d at 560.

[3] "Equitably moot" bankruptcy appeals are not necessarily "moot" in the constitutional sense: they may persist in very live dispute between adverse parties. Thus, in the Seventh Circuit, Judge Easterbrook "banish[ed] 'equitable mootness' from the (local) lexicon." *In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994). In *SemCrude*, 728 F.3d at 317 n.2, we noted that the term "prudential forbearance" more accurately reflects the decision to decline hearing the merits of an appeal because of its feared consequences should a bankruptcy court's decision approving plan confirmation be reversed.

whatever relief is practicable instead of declining review simply because full relief is not available." *In re Blast Energy Servs., Inc.*, 593 F.3d 418, 425 (5th Cir. 2010) (internal quotation marks omitted) (citations omitted).

We first recognized the doctrine of equitable mootness in *In re Continental Airlines*, 91 F.3d 553 (3d Cir. 1996) (*en banc*). The case closely divided our Court, with seven judges voting to recognize the doctrine over the dissent of six. We explicitly held that it was the law of our Circuit but did not lay down any particularly clear guidance on how to decide whether an appeal was moot. Instead, the majority opinion noted certain factors theretofore considered in making a mootness call:

> Factors that have been considered by courts in determining whether it would be equitable or prudential to reach the merits of a bankruptcy appeal include (1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments.

*Id.* at 560 (citation omitted). This statement reveals that the doctrine was then, as far as our Court was concerned, in its infancy. Note, for example, that we listed "[f]actors that have been considered by courts" without specifying whether those factors are entitled to equal weight or whether any is necessary or sufficient. *Id.* Over the years, our precedential opinions have refined the doctrine to its current, more determinate state. As we recently put it,

11

> equitable mootness . . . proceed[s] in two analytical steps: (1) whether a confirmed plan has been substantially consummated; and (2) if so, whether granting the relief requested in the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who have justifiably relied on plan confirmation.

*SemCrude*, 728 F.3d at 321.

This two-step inquiry reduces uncertainty from the factors of *Continental*, and this appeal reflects the importance of *SemCrude*'s step (2): in cases where relief would *neither* fatally scramble the plan *nor* significantly harm the interests of third parties who have justifiably relied on plan confirmation, there is no reason to dismiss as equitably moot an appeal of a confirmation order for a plan now substantially consummated. For example, reliance on consummation of a plan would not be justified if a third party obtained a benefit that was inconsistent with a contract, statute, or judgment, as any benefit from such an error would result in "ill-gotten gains." *See In re Charter Commc'ns, Inc.*, 691 F.3d 476, 484 (2d Cir. 2012) ("[I]t would not be inequitable to require the parties to [an illegal] agreement to disgorge their ill-gotten gains, participation in the appeal or not.").

While courts and counsel readily understand when granting relief on appeal would unravel a plan both confirmed and consummated, who are the "third parties" that equitable mootness is meant to protect? *Continental* singled out investors as the "particular" beneficiaries of equitable mootness, 91 F.3d at 562, while *SemCrude* discussed the interests of lenders, customers, and suppliers. 728 F.3d at 325. Likewise, *Philadelphia Newspapers* considered the interests of "other creditors" who were not equity investors. 690 F.3d 161, 171 (3d Cir. 2012). These cases teach that,

12

although parties other than equity investors may rely on plan consummation and thus claim protection in the form of equitable mootness, they may not "merit the same 'outside investor' status as" those who make equity investments in a reorganized entity. *In re Zenith Elecs. Corp.*, 250 B.R. 207, 217 (D. Del. 2000), *aff'd sub nom. Nordhoff Investments, Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180 (3d Cir. 2001).

One reason some third parties have reliance interests more worthy of protection than others is that we want to encourage behavior (like investment in a reorganized entity) that contributes to a successful reorganization. *See Continental*, 91 F.3d at 564 ("[T]here was an integral nexus between the investment [by the parties urging mootness] and the success of the Plan."); *see also id.* at 563 ("[T]he Eastern claims were crucial to the willingness of the Investors to consummate the Financing Transaction." (internal quotation marks omitted)).

Also, in appropriate circumstances we further the free flow of commerce—a chief concern of commercial bankruptcy—when we decline to disturb "complex transactions undertaken after the Plan was consummated" that would be most difficult to unravel. *Charter*, 691 F.3d at 485 ("The Allen Settlement was the product of an intense multi-party negotiation, and removing a critical piece of the Allen Settlement—such as Allen's compensation and the third-party releases—would impact other terms of the agreement and throw into doubt the viability of the entire Plan."); s*ee also id.* at 486 ("[T]he third-party releases were critical to the bargain that allowed Charter to successfully restructure[,] and . . . undoing them, as the plaintiffs urge, would cut the heart out of the reorganization.").

At the same time, if funds can be recovered from third parties without a plan coming apart, it weighs heavily against

barring an appeal as equitably moot, both in our Court and other circuits. *See In re PWS Holding Corp.*, 228 F.3d 224, 236–37 (3d Cir. 2000) (appeal not moot where appellant "seeks to invalidate releases that affect the rights and liabilities of third parties [and t]he plan has been substantially consummated, but . . . the plan could go forward even if the releases were struck"); *In re Paige*, 584 F.3d 1327, 1342 (10th Cir. 2009) ("The substantial consummation of a bankruptcy plan may make providing relief difficult, and may raise concerns about fairness to third parties, but '[c]ourts can and do order divestiture or damages in' situations where business deals or bankruptcy plans have been wrongly consummated." (quoting *In re Res. Tech. Corp.*, 430 F.3d 884, 886–87 (7th Cir. 2005) (alteration in *Paige*))). We agree with the Second Circuit that the disgorgement of "ill-gotten gains" is proper assuming that the disgorgement otherwise leaves a plan of reorganization not in tatters. *Charter*, 691 F.3d at 484.

In addition to the third parties (particularly investors) identified in our cases, equitable mootness properly applied benefits the estate, *In re Zenith Elecs. Corp.*, 329 F.3d 338, 346 (3d Cir. 2003), and the reorganized entity, *id.* at 344. All these players have a common interest in the finality of a plan: the estate because it can wind up; the reorganized entity because it can begin to do business without court supervision and can seek funding in the capital markets without the cloud of bankruptcy; investors because a reorganized entity will command a higher and more stable market value outside of bankruptcy; lenders because they can collect interest and principal; customers in certain industries who need parts or services; and other constituents for different context-specific reasons that may boil down to it is easier to do business with an entity outside of bankruptcy. Equitable mootness assures these stakeholders that a plan confirmation order is reliable and that they may make financial decisions based on a

14

reorganized entity's exit from Chapter 11 without fear that an appellate court will wipe out or interfere with their deal.

The theme is that the third parties with interests protected by equitable mootness generally rely on the emergence of a reorganized entity from court supervision. When a successful appeal would not fatally scramble a confirmed and consummated plan, this specific reliance interest most often is not implicated, as the plan stays in place (with manageable modifications possible) and the reorganized entity remains a going concern. For example, the remedy of taking from one class of stakeholders the amount given to them in excess of what the law allows is not apt to be inequitable, as there is little likelihood it will have damaging ripple effects beyond the classes that the redistribution immediately affects. Consistent with our conclusion in *PWS*, 228 F.3d at 236–37, and as the Second Circuit reasoned in *Charter*, 691 F.3d at 484, when taking a payment to which one class is not contractually entitled, and giving it to the party contractually entitled to those funds, would not undermine the basis for other parties' reliance on the finality of confirmation, it makes little sense to deem an appeal equitably moot.

### B. *Aurelius's Appeal is Equitably Moot.*

Aurelius concedes that the DCL Plan is substantially consummated, Aurelius Br. at 24 & 26, but it argues that the relief it seeks would neither scramble that Plan nor harm third parties who have relied on consummation. Aurelius asks us to have the confirmation order modified to reinstate the settled LBO-Related Causes of Action. *Id.* at 58. It argues that it should be allowed to pursue these claims or settle them on more favorable terms and that it can obtain relief from reorganized Tribune, from the LBO lenders themselves, or by

15

redistributing the LBO lenders' future recovery from the litigation trust. *Id.* at 27–38.

Aurelius's argument that the relief it ultimately seeks—further recovery on the LBO-Related Causes of Action—can be afforded (at least in part) misses the point of the equitable mootness inquiry. We must also ask whether the *immediate* relief Aurelius seeks, revocation of the Settlement in the DCL Plan, would "fatally scramble the plan and/or . . . significantly harm third parties who have justifiably relied on plan confirmation." *SemCrude*, 728 F.3d at 321. We believe it would do both.

To the first concern (fatal scrambling), the Bankruptcy Court noted the obvious: the Settlement was "a central issue in the formulation of a plan of reorganization." *Tribune*, 464 B.R. at 142. Though it is within the power of an appellate court to order the Settlement severed from the Plan and keep the rest of the Plan in place—thereby not attempting to "unscramble the eggs," *Continental Airlines*, 91 F.3d at 566, or turning a court into a "Humpty Dumpty repairman," *In re Pub. Serv. Co. of New Hampshire*, 963 F.2d 469, 475 (1st Cir. 1992), or any other ovoid metaphor—allowing the relief the appeal seeks would effectively undermine the Settlement (along with the transactions entered in reliance on it) and, as a result, recall the entire Plan for a redo.

Third-party reliance is related here to the problem of scrambling the Plan, as returning to the drawing board would at a minimum drastically diminish the value of new equity's investment. That investment no doubt was in reliance on the Settlement, as indeed was the reliance of those who voted for the Plan. Aurelius proposed a Noteholder Plan that didn't include a settlement of the LBO-Related Causes of Action, and it was overwhelmingly rejected by all but 3 of the 243 creditor classes (the remaining classes were Aurelius', the

PHONES Notes', and a third "class in which a single creditor holding a claim of $47 voted in favor of both the DCL Plan and the Noteholder Plan," *id.* at 207). Revoking the Settlement would circumvent the bankruptcy process and give Aurelius by judicial fiat what it could not achieve by consensus within Chapter 11 proceedings or, we can't help but add, if it had put up a bond.

On appeal, Aurelius proposes no relief that would not involve reopening the LBO-Related Causes of Action. Allowing those suits would "'knock the props out from under the authorization for every transaction that has taken place,'" thus scrambling this substantially consummated plan and upsetting third parties' reliance on it. *In re Chateaugay Corp.*, 10 F.3d 944, 953 (2d Cir. 1993) (quoting *In re Roberts Farms, Inc.*, 652 F.2d 793, 797 (9th Cir. 1981)). In this context, the District Court did not abuse its discretion in concluding that Aurelius's appeal is equitably moot.

When determining whether the case is equitably moot, we of course must assume Aurelius will prevail on the merits because the idea of equitable mootness is that *even if* Aurelius is correct, it would not be fair to award the relief it seeks. One might argue that holding the appeal moot is therefore by definition *in*equitable: if Aurelius prevails, that means the Bankruptcy Court committed legal error, and it could not be inequitable to correct the Court's mistakes. The reasons to reject this hypothesis are twofold.

First, bankruptcy is concerned primarily with achieving a workable outcome for a diverse array of stakeholders, and the reliable finality of a confirmed and consummated plan allows all interested parties to organize their lives around that fact. *See* Mark J. Roe, *Bankruptcy and Debt: A New Model for Corporate Reorganization*, 83 Colum. L. Rev. 527, 529 (1983) (identifying speed as one of

17

"three principal characteristics desirable for a reorganization mechanism").

Second, and relatedly, an important reason we should forbear from hearing a challenge to the order before us is because of Aurelius's failure to post a bond to obtain a stay pending appeal. Courts may condition stays of plan confirmation orders pending appeal on the posting of a *supersedeas* bond. The purpose of requiring such a "bond in a bankruptcy court is to indemnify the party prevailing in the original action against loss caused by an unsuccessful attempt to reverse the holding of the bankruptcy court." *In re Theatre Holding Corp.*, 22 B.R. 884, 885 (Bankr. S.D.N.Y. 1982). Federal Rule of Civil Procedure 62(d) (made applicable to bankruptcy cases by Bankruptcy Rule 7062) provides for stays pending appeal as of right when a bond is posted in damages actions "or where the judgment is sufficiently comparable to a money judgment so that payment on a supersedeas bond would provide a satisfactory alternative to the appellee." 10 Collier on Bankruptcy ¶ 7062.06 (16th ed. 2015).

In this case, the Bankruptcy Court carefully calculated the likely damage to the estate of a stay pending an appeal from its confirmation order. In particular, it analyzed the following costs to Tribune and its creditors that a stay would cause: additional professional fees, opportunity costs to creditors who would receive delayed distributions from the DCL Plan or delayed interest and principal payments from reorganized Tribune, and a loss in market value to equity investors caused by the delayed emergence. *Tribune*, 477 B.R. at 480–83. We need not go through the opinion in detail, as Aurelius does not squarely argue that the bond requirement was an abuse of discretion, but we note that the valuation was well-considered and as convincing as the alchemy of valuation in bankruptcy can be.

18

As a result of its calculations, the Court determined that Aurelius should post a $1.5 billion bond to guarantee that the estate could be indemnified in the case of an unsuccessful appeal. *Id.* at 483. We repeat that Aurelius never challenged the bond amount, instead attempting unsuccessfully to modify the order to remove the bond in its entirety. But given the Bankruptcy Court's findings on the likely substantial loss to Tribune due to an appeal, a *supersedeas* bond in some amount was appropriate. Aurelius's failure to attempt to reduce the bond to a more manageable figure (assuming its representations are correct that it would be unable to finance such a large bond on short notice) leads us to conclude that it effectively chose to risk a finding of equitable mootness and implicitly decided that an appeal with a stay conditioned on any reasonable bond amount was not worth it. This risk-adjusted choice by such a rational actor makes a finding of mootness not unfair, as it appears from the record before us that Aurelius had the opportunity to obtain a stay that would have foreclosed the possibility of a mootness finding.[4]

---

[4] To the extent it could be argued that our approach endangers any low-value appeal in a large case (because the cost of a stay would overwhelm any potential recovery), we note that the lower a potential recovery is, the less likely an appeal is to be equitably moot because courts will be more willing to make minor changes to a plan of reorganization than big ones. *See Phila. Newspapers*, 690 F.3d at 170 (claim worth 1.7% of the price of debtor's assets not equitably moot); *Chateaugay*, 10 F.3d at 953 (claim worth up to 10% of a reorganized debtor's working capital was not equitably moot).

## C. The Trustees' Appeal is Not Equitably Moot.

To reiterate, the Trustees contend that they are beneficiaries of a subordination agreement that guarantees that they will receive any recovery that goes to the holders of the PHONES and EGI Notes ahead of a class of trade and other creditors (Class 1F). This $30 million intercreditor dispute is not equitably moot. Indeed, there is no prudent reason to forbear from deciding the merits of the Trustees' appeal.

Again, it is conceded that the Plan has been substantially consummated. Thus we turn to *SemCrude*'s second question: "whether granting the relief requested in the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who have justifiably relied on plan confirmation." 728 F.3d at 321. The answer is no.

The merits question presented by the Trustees' appeal is straightforward: does the Plan unfairly allocate Class 1E's recovery to 1F? If the answer is yes, disgorgement could be ordered against those Class 1F holders who have received more than their fair share, and the Litigation Trust's waterfall can be restructured to make sure that 1E gets its recovery to the exclusion of 1F. There's no chance that this modification would unravel the Plan: the dispute is about whether one of two classes of creditors is entitled to $30 *million* in the context of a $7.5 *billion* reorganization.

Nor, if the Trustees rightly read the subordination agreement, has anyone "justifiably relied," *id.*, on the finality of the confirmation order with respect to the $30 million. It is true that some of the money has been paid out, but it has gone to a readily identifiable set of creditors against whom disgorgement can be ordered, and, assuming the Trustees

20

prevail on the merits, Class 1F members by definition cannot *justifiably* have relied on the payments. The Class 1F payouts are not "ill-gotten," *Charter*, 691 F.3d at 484, in the sense that the members of that class received them as a result of malfeasance, but the Trustees' argument is that the payments were not valid. Although the trade creditors and retirees who make up Class 1F are likely not sophisticated players and may have understandably relied on any payouts they received, any reliance they have placed on the Plan confirmation and implementation—again, assuming the Trustees' argument on the merits is correct—is still not legally justifiable because Class 1F's claim of entitlement to the money is unlawful under the Trustees' interpretation of the relevant contract.

Moreover, disgorgement from Class 1F is not the only possible remedy here (though conceptually it is the most straightforward). On remand, if the Trustees prevail on the merits, the District Court could enjoin future revenue streams of the litigation trust from going to Class 1F until Class 1E is paid in full. To the extent this would result in disparate initial distributions to the members of Class 1F who participated in the litigation trust and those who elected all cash distributions, the Court could allow payment of this difference to the Class 1F creditors who elected to participate in the trust first before diverting recoveries to Class 1E, thus effectively revoking the option to choose between an initial all-cash distribution and partial cash distribution plus participation in the litigation trust, as the Trustees suggest. Trustees Br. at 19. Tribune's only response to this proposal by the Trustees is the unsupported statement that it "would be a logistical nightmare and would result in chaos." Tribune Response at 71 (internal quotation marks omitted). We fail to see the chaos and thus view this as a possible remedial option within the District Court's discretion.

21

The District Court held in a conclusory fashion that "[h]undreds of individuals and small-business trade creditors . . . were entitled to rely upon the finality of the Confirmation Order," 2014 WL 2797042 at *6, but that misses the point of equitable mootness and elevates finality over all other interests. The Plan has arguably deprived one prepetition lender class of $30 million. Requiring Class 1F to pay $30 million to Class 1E if the latter prevails on appeal would not affect Tribune's value and thus not any of its investors (nor would it harm the estate or new Tribune). It would be *unfortunate* from the perspective of the members of Class 1F to require disgorgement, but, if they were never entitled to that money in the first place, it is not *unfair*, and mootness must be fair (equitable in legalese) to be invoked.

Equitable mootness gives limited protection to those who have justifiably relied on the finality of a consummated plan, particularly new equity. No one is arguing that, if the Class 1F creditors lose, the consequences would be any worse than requiring them to forgo a windfall they never should have gotten in the first place. Because we disagree that this class of creditors was entitled to rely on the DCL Plan's finality (once again assuming that the Trustees should prevail on appeal), we hold that the District Court made an error of law and therefore abused its discretion in holding as it did.

### D.    Delays Below

Both appellants write with strong language about the District Court's delays in hearing their appeals, and they characterize Tribune as having "dragg[ed its] heels" throughout the proceeding. Aurelius Br. at 20; *see also* Trustees Br. at 10 (incorporating by reference Aurelius's argument that Tribune caused delays in hearing any appeal). Tribune responds that the District Court did nothing more than refuse to give appellants special treatment and that

22

Tribune repeatedly indicated that it would comply with the briefing schedule the District Court imposed. Notably, the appellants do not squarely make an argument that the District Court abused its discretion in setting a briefing schedule; it seems they complain of the timeline to add to the atmosphere of unfairness they are trying to conjure.

In any event, it does not seem that Tribune is to blame for the delay. True, it opposed expedition of the appeal, but there is no suggestion that it missed deadlines or filed abusive motions for extensions of time. And the appellants do not complain of the delay between consummation (December 31, 2012) and decision (June 2014); rather, they complain that the District Court should have decided the case sometime between plan confirmation (July 23, 2012) and consummation (again, December 31, 2012). One hundred sixty-one days is not short, but it's also not unusual for large cases to take that long to decide. Most importantly, Aurelius and the Trustees do not actually seek relief for the delay; they just complain about it. For all these reasons, the delays below, though arguably unfortunate, do not affect the analysis here.

## IV. Conclusion

Aurelius's appeal is equitably moot: the DCL Plan is consummated; Aurelius spurned the offer of a stay accompanied by a bond; and it would be unfair to Tribune's investors, among others, to allow Aurelius to undo the most important aspect of the overwhelmingly approved Plan. By contrast, the Trustees' appeal is not equitably moot: assuming the Trustees prevail on the merits, Class 1F holders must forgo gains to which they were never entitled. Other third parties will not be harmed, nor is the Plan even remotely called into question. We thus affirm in part, reverse in part, and remand.

In re: Tribune Media Company, et al
Nos. 14-3332 & 14-3333

_____

AMBRO, <u>Circuit Judge</u>, with whom VANASKIE, <u>Circuit Judge</u>, joins, concurring.

Counsel for Aurelius and the Trustees asserted at oral argument that our *en banc* case *In re Continental Airlines*, 91 F.3d 553 (3d Cir. 1996), wrongly recognized the doctrine of equitable mootness. At least one esteemed colleague of our Court agrees and has called for its reconsideration. *See In re: One2One Commc'ns, LLC*, No. 13-3410, 2015 WL 4430302, at *7 (3d Cir. July 21, 2015) (Krause, J., concurring). The *One2One* concurrence makes three principal challenges to the doctrine: constitutional (Article III of the Constitution requires supervision of decisions by Article I bankruptcy judges); statutory (the Bankruptcy Code does not authorize equitable mootness); and prudential (it is unfair to appellants to deny them relief when a bankruptcy or district court has made an error of law). While we do not need to address every argument made in that concurrence, its well-crafted challenge to equitable mootness makes it worthwhile to lay out briefly why this judge-made doctrine is abided by every Court of Appeals.

## I.    Equitable Mootness Does Not Violate Article III.

The *One2One* concurrence expresses "serious constitutional concerns" with the equitable mootness doctrine. *Id.* at *15. Perhaps the reason this argument does not make it all the way past the goal line to conclude the doctrine is actually unconstitutional is that Supreme Court precedent refutes the position.

1

The *One2One* concurrence is concerned that equitable mootness insulates the judgments of Article I bankruptcy judges' from review by an Article III tribunal and thus violates (1) a personal right to an Article III adjudicator and (2) the integrity of the judicial branch of our Government. To the extent that the right to Article III review is "personal," we note that the specific personal right the Supreme Court has identified is "to have claims decided before judges who are free from potential domination by other branches of government." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848 (1986) (internal quotation marks omitted). As an equitable doctrine applied by Article III courts, equitable mootness does not implicate this right.

As for the structural concern, the argument rests on an expansive reading of lines of cases where the Supreme Court considered whether *Congress* may redirect adjudication from state courts and Article III courts to Article I courts. Not *one* of the cases relied on discusses whether an Article III court may abstain from hearing a case, as the primary evil the cases address (congressional aggrandizement) is irrelevant. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1944 (2015) ("Article III . . . bar[s] *congressional* attempts 'to transfer jurisdiction [to non-Article III tribunals] for the purpose of emasculating' constitutional courts and thereby prevent[ing] 'the encroachment or aggrandizement of one branch at the expense of the other.'" (quoting *Schor*, 478 U.S. at 850) (emphasis added) (last two alterations in original)); *Stern v. Marshall*, 131 S. Ct. 2594, 2620 (2011) ("Is there really a threat to the separation of powers where Congress has conferred the judicial power outside Article III only over certain counterclaims in bankruptcy? The short but emphatic answer is yes. A statute may no more lawfully chip away at the authority of the Judicial Branch than it may eliminate it entirely."); *Thomas v. Union Carbide Agricultural Prods. Co.*, 473 U.S. 568, 590 (1985) ("Congress . . . select[ed]

2

arbitration as the appropriate method of dispute resolution. Given the nature of the right at issue and the concerns motivating the Legislature, we do not think this system threatens the independent role of the Judiciary in our constitutional scheme."); *N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 83 (1982) ("The constitutional system of checks and balances is designed to guard against encroachment or aggrandizement by Congress at the expense of the other branches of government." (internal quotation marks omitted)); *United States v. Raddatz*, 447 U.S. 667, 681 (1980) ("Congress was alert to Art. III values concerning the vesting of decisionmaking power in magistrates. . . . We need not decide whether, as suggested by the Government, Congress could constitutionally have delegated the task of rendering a final decision on a suppression motion to a non-Art. III officer. Congress has not sought to make any such delegation." (footnote omitted) (citation omitted)); *Crowell v. Benson*, 285 U.S. 22, 49 (1932) ("'[W]e do not consider [C]ongress can . . . withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.'" (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1855)).

If it seems formalistic to conclude that a court may abstain from deciding a case even though Congress may not withdraw the same case from the court's cognizance, that is because the Supreme Court's separation-of-powers cases—at least where they hold that an Article III violation has occurred—are often formalistic. *See Wellness*, 135 S. Ct. at 1950 (Roberts, C.J. [the author of *Stern*], dissenting) ("I would not yield so fully to functionalism."). Neither the personal rights nor the separation of powers guaranteed by Article III are infringed when Article III courts decline to hear a quite constricted class of cases seeking relief that would upend cases resolved and plans implemented (often

3

years before) and/or would significantly harm third parties who relied on that resolution and implementation. We therefore do not share the constitutional concerns expressed in the *One2One* concurrence.

## II. The Bankruptcy Code Does Not Bar the Equitable Mootness Doctrine.

"[E]very Circuit Court has recognized some form of equitable mootness," save the Federal Circuit (which does not hear bankruptcy appeals). Nil Ghosh, *Plan Accordingly: The Third Circuit Delivers a Knockout Punch with Equitable Mootness*, 23 Norton J. Bankr. L. & Prac. 224 & n.8 (2014) (collecting cases).[1] Though of course that does not prove the doctrine's validity, it is a starting point that counsels us to tread lightly in our examination.

One prominent and frequently cited explanation for the genesis of equitable mootness is that various provisions of the Bankruptcy Code, notably §§ 363(m) and 1127(b), bespeak a

---

[1] *See In re Healthco Int'l, Inc.*, 136 F.3d 45, 48 (1st Cir. 1998); *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 481 (2d Cir. 2012); *In re U.S. Airways Grp., Inc.*, 369 F.3d 806, 809 (4th Cir. 2004); *In re Pac. Lumber Co.*, 584 F.3d 229, 240 (5th Cir. 2009); *In re United Producers, Inc.*, 526 F.3d 942, 947 (6th Cir. 2008); *In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994); *In re President Casinos, Inc.*, 409 F. App'x 31 (8th Cir. 2010) (unpublished); *In re Thorpe Insulation Co.*, 677 F.3d 869, 880 (9th Cir. 2012); *In re Paige*, 584 F.3d 1327, 1337 (10th Cir. 2009); *In re Holywell Corp.*, 911 F.2d 1539, 1543 (11th Cir. 1990), *rev'd on other grounds sub nom. Holywell Corp. v. Smith*, 503 U.S. 47 (1992); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1147–48 (D.C. Cir. 1986).

congressional intent "that courts should keep their hands off consummated transactions." *In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994) (Easterbrook, J.). The former provides that if a sale to a good faith purchaser under 11 U.S.C. § 363 is reversed on appeal, the reversal will not affect the validity of the sale to the purchaser, while § 1127(b) limits parties' ability to modify plans of reorganization following substantial consummation. However, § 1127(b) on its own terms is not read to limit the authority of appellate courts to forbear reviewing for prudential reasons appeals from orders confirming plans now consummated. *UNR*, 20 F.3d at 769. Although § 1129, the plan confirmation provision, is silent on the authority of courts to upend consummated plans at late dates, *UNR* considered that omission an "interstice[]" or gap that courts may fill to effect the intent of Congress to protect the finality of consummated plans, a policy goal that the bench, bar, and academy all recognize as undergirding equitable mootness. *See, e.g.*, *id.*; Lenard Parkins *et al.*, *Equitable Mootness: Will Surgery Kill the Patient?*, 29 Am. Bankr. Inst. J. 40 (2010), Troy A. McKenzie, *Judicial Independence, Autonomy, and the Bankruptcy Courts*, 62 Stan. L. Rev. 747, 789–90 (2010) (describing doctrine and its justifications).

A simpler way to reach the same conclusion starts from the premise that "bankruptcy courts . . . are courts of equity and appl[y] the principles and rules of equity jurisprudence." *Young v. United States*, 535 U.S. 43, 50 (2002) (last alteration in original) (internal quotation marks omitted); *accord Cybergenics Corp. v. Chinery*, 330 F.3d 548, 567 (3d Cir. 2003) (*en banc*) ("[B]ankruptcy courts are equitable tribunals that apply equitable principles in the administration of bankruptcy proceedings."). As Judge Posner has put it, equitable mootness "is perhaps best described as merely an application of the age-old principle that in formulating equitable relief a court must consider the

5

effects of the relief on innocent third parties." *In re Envirodyne Indus., Inc.*, 29 F.3d 301, 304 (7th Cir. 1994) (Posner, J.); *see also In re Paige*, 584 F.3d 1327, 1335 (10th Cir. 2009) ("[T]he doctrine of equitable mootness is rooted, at least in part, in the court's discretionary power to fashion a remedy in cases seeking equitable relief."); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1147–48 (D.C. Cir. 1986) ("[T]here exists . . . a melange of doctrines relating to the court's discretion in matters of remedy and judicial administration. Even when the moving party is not entitled to dismissal on [A]rticle III grounds, common sense or equitable considerations may justify a decision not to decide a case on the merits." (internal quotation marks omitted) (citations omitted)). Our take is that, in the equitable mootness context, courts may consider whether it is fair in stark circumstances to grant relief that will scramble a consummated plan or will upset third parties' legitimate reliance on the finality of such a plan.

In awarding injunctions, a classic form of equitable relief, courts always consider the balance of harms to the parties and the public. Equitable mootness, properly applied, similarly reflects a court's decision that when undoing a confirmed and consummated plan would do more harm to many than good for one (or but a few), this is inappropriate for a court in equity. To illustrate this principle, consider cases where injunctions are statutorily authorized but courts still decline to issue one even in the face of a violation and in the absence of an alternative remedy. For example, in *Weinberger v. Romero-Barcelo*, the Navy violated the Federal Water Pollution Control Act (FWPCA) by discharging ordnance into navigable waters. 456 U.S. 305, 309 (1982). Rather than enjoin this practice, the District Court ordered the Navy to apply for a permit to continue its discharges, but specifically allowed the Navy to continue its unpermitted activities while its application was pending. The Court did so

6

because, on balancing the equities in the case, it found that the injunction "would cause grievous, and perhaps irreparable harm, not only to Defendant Navy, but to the general welfare of this Nation." *Romero-Barcelo v. Brown*, 478 F. Supp. 646, 707 (D.P.R. 1979). The Supreme Court held that the decision whether to allow a preliminary injunction was left to the sound discretion of the District Court notwithstanding the apparent ongoing violation of the FWPCA. *Romero-Barcelo*, 456 U.S. at 320.

Similarly, in the preliminary injunction context, the Supreme Court has allowed district courts to deny relief even if the party seeking it meets convincingly the success-on-the-merits requirement. In *Amoco Prod. Co. v. Gambell, Alaska*, a federal agency allowed oil companies to drill for oil on public lands without giving notice to affected Alaska Natives, an alleged violation of the Alaska National Interest Lands Conservation Act. 480 U.S. 531 (1987). Alaska Natives sought a preliminary injunction barring the drilling. The District Court held that, while the Act applied to the permitting agency, the public interest weighed in favor of oil exploration under the facts presented and, on balance, denied the preliminary injunction. The Supreme Court held that withholding relief was proper despite the finding of a "strong likelihood" of success on the merits. *Id.* at 541, 544–46.

Although these cases are far from factually on point here, they reinforce the appropriateness of courts' discretion in issuing or withholding equitable remedies. The doctrine of equitable mootness recognizes those few situations where the practical harm caused by granting relief would greatly outweigh the benefit. Discretion is no less appropriate in the plan confirmation context than in ordering other equitable remedies; hence we believe that the *One2One* concurrence's formal challenge that equitable mootness lacks a basis in law misses the point that it is in the *equitable* toolbox of judges

for that scarce case where the relief sought on appeal from an implemented plan, if granted, would leave the plan in tatters and/or bankruptcy battlefield strewn with too many injured bodies.

### III. Equitable Mootness Can Be Beneficial as a Practical Matter.

As for the practical challenge, we acknowledge the unfairness that might result where an aggrieved party is deprived of appellate relief even in the face of an erroneous lower court decision. But remember, equitable mootness is only in play for consideration when modifying a court order approving a since-consummated plan would do significant harm. The possibility that a successful appeal will not cause such harm is no reason to abandon the doctrine altogether. Rather, it counsels us to adhere to our precedent that equitable mootness "should be the rare exception and not the rule." *Id.* at 321. Moreover, our Court has certainly not been reluctant to reverse ill-advised equitable mootness grants. *See, e.g.*, *supra*, Maj. Op. at II.C; *Semcrude*, 728 F.3d 314 at 323; *Phila. Newspapers*, 690 F.3d at 170; *Zenith Elecs. Corp.*, 329 F.3d at 346.

Cases where prudence counsels courts not to hear appeals are rare, but they are real. Complex bankruptcies reorganize thousands of relationships among countless parties. When a plan is substantially consummated, it is sometimes not only as difficult to restore an estate to the *status quo ante* consummation as it is to gather all the feathers from the proverbial pillow, it is also a crushing expense to the reorganized entity and its shareholders. If we jettisoned the entire equitable mootness doctrine, it is hard to imagine that any complex plan would be consummated until all appeals are terminated. For why would an equity investor wish to put money into a reorganized entity if the plan could be ordered

unraveled? And would not the cost of credit increase prohibitively with such a specter? Without equitable mootness, any dissenting creditor with a plausible (or even not-so-plausible) sounding argument against plan confirmation could effectively hold up emergence from bankruptcy for years (or until such time as other constituents decide to pay the dissenter sufficient settlement consideration to drop the appeal), a most costly proposition.

The costs of remaining in bankruptcy underscore one factor that significantly mitigates the injustice to a wronged appellant whose cause may otherwise be deemed moot—the availability of a stay pending appeal. Indeed, If a party obtains a stay, the plan cannot be substantially consummated and thus the appeal cannot be equitably moot.

We acknowledge, however, that stays are costly to estates: in order to operate a business without court supervision and in order to sell shares on the public markets, entities must emerge from bankruptcy with prepetition liabilities restructured or discharged. Thus every day that a company remains in bankruptcy is a day when it will have a hard time attracting the investors, employees, and, in some industries, customers that it needs to exist and prosper.

To protect against this loss, courts may condition stays pending appeal on the posting of a *supersedeas* bond. As demonstrated by the careful discussion by Judge Carey in this case, valuing the costs for a stay of a plan confirmation order should be feasible in a case involving sophisticated business entities who can hire experts and litigate complex valuation questions. We thus see practical benefit to allowing a stay if the appellant is willing to post a bond set within a reasonable range. Such an order would balance the conceivable harms to various constituencies and would also shift to the appealing

party the burden of determining whether its appeal is really worth the candle.

## IV.    Conclusion

Were we able to revisit our Circuit's precedent that equitable mootness is available in the right circumstance (consequently rejecting the views of every other Circuit that hears bankruptcy appeals), we would decline to discard this tool of equity.[2]  In a very few cases, shutting an appellant out

---

[2] In addition to its challenge to the basis in law for equitable mootness, the *One2One* concurrence suggests several possible modifications to the doctrine should it remain.  We express no views with respect to whether some or all of those proposed changes would be beneficial.  However, we note that it would be unwise to crystallize as a requirement what Judge Krause's concurrence views as a trend in favor of deciding the merits of an appeal *before* equitable mootness is addressed.  Slip Op. at 25–27 (advocating that we "requir[e] a ruling on the merits" before deciding whether to forbear deciding the appeal) (citing *In re Envirodyne Indus., Inc.*, 29 F.3d at 303–04; *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005); *Behrmann v. Nat'l Heritage Foundation*, 663 F.3d 704, 713 n.3 (4th Cir. 2011)).  While we certainly agree that "a court is not inhibited from considering the merits before considering equitable mootness," *Metromedia*, 416 F.3d at 144, and add that such an approach often will save substantial time, energy, and money, courts have had unpleasant experiences with "rigid order[s] of battle" like this before, and we do not see the wisdom of an ironclad requirement for all cases.  *Pearson v. Callahan*, 555 U.S. 223, 234 (2009) (internal quotation marks

of the courthouse does substantially less harm than locking a debtor inside.  Federal courts have ample equitable authority to decide when no remedy is appropriate, and thus, though we should always presume that appeal merits be reached and act with the utmost care when we turn aside an appeal, equitable mootness remains a last-ditch discretionary device for protecting the finality of an unstayed plan that has been consummated.

---

omitted); *see also Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (allowing personal jurisdiction to be decided before subject-matter jurisdiction notwithstanding recent case that had held deciding subject-matter jurisdiction first is a practice "inflexible and without exception," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998)).