PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-3210
_____

In re MILLENNIUM LAB HOLDINGS II, LLC., et al.,
Debtors

OPT-OUT LENDERS,
Appellant
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-17-cv-01461)
District Judge: Leonard P. Stark
_____

Argued
September 12, 2019

Before: CHAGARES, JORDAN, and RESTREPO, *Circuit
Judges.*

(Filed December 19, 2019)
_____

Maya Ginsburg
Thomas E. Redburn, Jr.   [ARGUED]
Sheila A. Sadighi
Lowenstein Sandler
One Lowenstein Drive
Roseland, NJ   07068

L. Katherine Good
Aaron H. Stulman
Christopher M. Samis
Potter Anderson & Corroon
1313 N. Market Street
Hercules Plaza, 6th Fl.
P.O. Box 951
Wilmington, DE   19801
        *Counsel for Appellant*

John C. O'Quinn   [ARGUED]
Jason M. Wilcox
Kirkland & Ellis
1301 Pennsylvania Avenue, N.W.
Washington, DC   20004
        *Counsel for Appellee James Slattery*

Derek C. Abbott
Joseph C. Barsalona, II
Andrew R. Remming
Morris Nichols Arsht & Tunnell
1201 Market Street – 16th Fl.
P.O. Box 1347
Wilmington, DE   19801

Gregory W. Fox
Michael H. Goldstein
William P. Weintraub
Goodwin Procter
620 Eighth Avenue
The New York Times Building
New York, NY   10018
    *Counsel for Appellee TA Millennium Inc.*

Ryan M. Bartley
Pauline K. Morgan
Michael R. Nestor
Young Conaway Stargatt & Taylor
1000 N. King Street
Wilmington, DE   19801

Richard P. Bress
Latham & Watkins
555 11th Street, N.W. – Ste. 1000
Washington, DC   20004

Amy C. Quartarolo
Michael J. Reiss
Latham & Watkins
355 S. Grand Avenue – Ste. 100
Los Angeles, CA   90071
    *Counsel for Debtor*

_____

OPINION OF THE COURT
_____

3

JORDAN, *Circuit Judge*.

We are asked whether the Bankruptcy Court, without running afoul of Article III of the Constitution, can confirm a Chapter 11 reorganization plan containing nonconsensual third-party releases and injunctions. On the specific, exceptional facts of this case, we hold that the Bankruptcy Court was permitted to confirm the plan because the existence of the releases and injunctions was "integral to the restructuring of the debtor-creditor relationship." *Stern v. Marshall*, 564 U.S. 462, 497 (2011) (internal quotation marks and citation omitted). We further conclude that the remainder of this appeal is equitably moot, and we will therefore affirm the decision of the District Court.

## I.    BACKGROUND

The debtors before the Bankruptcy Court and District Court were Millennium Lab Holdings II, LLC ("Holdings"), its wholly-owned subsidiary, Millennium Health LLC, and RxAnte, LLC, a wholly-owned subsidiary of Millennium Health LLC, all of which we will refer to collectively as "Millennium." Millennium (as reorganized), along with certain of its direct and indirect pre-reorganization shareholders, specifically TA Millennium, Inc. ("TA"), TA Associates Management, L.P., and James Slattery,[1] are the Appellees in this matter.

---

[1] Slattery was the founder of Millennium, has served in high-level positions in the company, and established trusts "for the benefit of himself and/or members of his family [and which] own approximately 79.896 percent of the stock of

4

Millennium provides laboratory-based diagnostic services. In April 2014, it entered into a $1.825 billion credit agreement with a variety of lenders, including a variety of funds and accounts managed by Voya Investment Management Co. LLC and Voya Alternative Asset Management LLC which, for convenience, we will refer to collectively as "Voya." Ultimately, Millennium used the proceeds from the 2014 credit agreement to refinance certain of its then-existing financial obligations and to pay a nearly $1.3 billion special dividend to its shareholders.

In March 2015, following a several-year investigation that dated back to at least 2012, the U.S. Department of Justice ("DOJ") filed a complaint in the United States District Court for the District of Massachusetts against Millennium, alleging violations of various laws, including the False Claims Act. Less than a month earlier, the Center for Medicare and Medicaid Services ("CMS") had notified Millennium that it would be revoking Millennium's Medicare billing privileges, the lifeblood of Millennium's business. In May 2015, Millennium reached an agreement in principle with the DOJ, CMS, and other government entities to pay $256 million to settle various claims against it.

Shortly thereafter, however, Millennium concluded that it lacked adequate liquidity to both service its debt obligations under the 2014 credit agreement and make the required settlement payment to the government. Millennium thus informed the 2014 credit agreement lenders of the government's claims and the decision to settle, prompting the

---

[Millennium Lab Holdings, Inc.][,]" a substantial pre-reorganization shareholder of Millennium. (App. at 981.)

5

formation of an ad hoc group of lenders, of which Voya was a member, to begin working with Millennium and its primary shareholders, TA and Millennium Lab Holdings, Inc. ("MLH"), to negotiate a transaction that would allow the company to satisfy the settlement requirements and restructure its financial obligations. As those negotiations progressed, the ad hoc group began suggesting that there were potential claims against MLH and TA relating to the 2014 credit agreement, including a lack of disclosure regarding the government's investigation into Millennium's business. Millennium, MLH, TA, and the ad hoc group began discussing how to resolve those potential claims.

While negotiating with the ad hoc group, Millennium informed the government that it could not pay the $256 million settlement without restructuring its other financial obligations. The government ultimately set a deadline of October 2, 2015, "by which the Company was required to finalize a proposal supported by the prepetition lenders and the Equity Holders[.]" (App. at 2231.) That deadline was later pushed to October 16 in exchange for, among other things, a $50 million settlement deposit to be paid for by Millennium and guaranteed by MLH and TA.

On October 15, 2015, Millennium, its equity holders, and the ad hoc group – Voya excepted – entered into a restructuring support agreement (the "Restructuring Agreement" or "Agreement"), which provided for either an out-of-court restructuring or a Chapter 11 reorganization of Millennium's business. Under the Agreement, MLH and TA agreed to pay $325 million, which would be used to reimburse Millennium for the $50 million settlement deposit, pay the remainder of the $256 million settlement, and cover certain of

6

Millennium's fees, costs, and working capital requirements. The Agreement also required Millennium's equity holders, including MLH and TA, to transfer 100% of the equity interests in Millennium to the company's lenders. Voya would receive its share of equity in the deal. In exchange, MLH, TA, and various others were to "receive full releases" for themselves and related parties regarding all claims arising from conduct that occurred before the Restructuring Agreement, including anything related to the 2014 credit agreement, and, in the case of a Chapter 11 reorganization, those individuals and entities covered by the Restructuring Agreement were to "be subject to a bar order, an injunction and related protective provisions" to enforce the releases. (App. at 518.) As a result of the Restructuring Agreement, Millennium was able to enter a final settlement with the government on October 16, 2015, which required payment of the settlement deposit in October and payment of the remainder of the settlement by December 30, 2015.

The Restructuring Agreement was reached only after intensive negotiations. Indeed, the negotiations were described by participants as "highly adversarial[,]" "extremely complicated[,]" and at "arm's-length," and in those negotiations "the parties all were represented by sophisticated and experienced professionals." (App. at 2229-30.) MLH and TA rejected the ad hoc group's suggestion of potential claims against them. "[P]rior to substantive negotiations commencing, it did not appear that [MLH and TA] had signaled a willingness to pay even any portion of the proposed … settlement." (App. at 2230.) Rather, they were only "willing to consider a tender of their equity ownership of the Company in exchange for broad general releases[.]" (App. at 2230.)

From at least mid-August 2015, negotiations took place "on an almost daily basis[.]" (App. at 2231.) Before September 30, however, and despite "extensive negotiations between the Equity Holders and the Ad Hoc Group during the prior months, the Equity Holders' last and 'best' offer was, in addition to turning over the Company's equity to the Lenders, $275 million[,] and the Ad Hoc Group … had demanded a $375 million contribution[.]" (App. at 2232-33.)

The impasse was broken during the negotiation session that occurred on September 30. That session was viewed as "do or die" for Millennium and as having "decisive implications for the lenders and the equity" because, if the October 2 deadline was not met, the government would revoke Millennium's Medicare billing privileges. (App. at 2231-32.) In the last event, MLH and TA increased their offer to $325 million, and the ad hoc group of lenders agreed to the revised terms. According to an individual involved in the negotiations, that deal – later embodied in the Agreement – was "the best possible deal achievable" and left nothing else "on the table[.]" (App. at 2233.)

The release provisions MLH and TA obtained in exchange for their contribution, were, in short, "heavily negotiated among the Debtors, the Equity Holders and the Ad Hoc Group" and necessary to the entire agreed resolution. (App. at 2234.) They "were specifically demanded by the Equity Holders as a condition to making the[ir] contribution" and, without them, MLH and TA "would not have agreed" to the settlement. (App. at 2234.) The contribution was, of course, also necessary to induce the lenders' support of the Agreement. Thus, as stated by both the Bankruptcy Court and

8

District Court after careful fact finding, the deal to avoid corporate destruction would not have been possible without the third-party releases.

After entering into the Restructuring Agreement, the parties thereto initially sought to reorganize Millennium out of court, and "over 93% of the Prepetition Lenders by value" agreed to do so. (App. at 1205.) That, however, was not enough. Voya held out, and Millennium filed its petition for bankruptcy in November 2015. It submitted to the Bankruptcy Court a "Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al." that reflected the terms of the Restructuring Agreement.[2] (App. at 407.) The plan contained broad releases, including ones that would bind non-consenting lenders such as Voya, in favor of Millennium, MLH, and TA, among others. Those releases specifically covered any claims "arising out of, or in any way related to in any manner," the 2014 credit agreement. (App. at 416.) To enforce the releases, the plan also provided for a bar order and an injunction prohibiting those bound by the releases from commencing or prosecuting any actions with respect to the claims released under the plan.

Voya objected to confirmation of the plan.[3] It explained that it intended to assert claims against MLH and TA for what it said were material misrepresentations made in connection

---

[2] The plan was later amended to eliminate a disputed provision that is not at issue in this appeal.

[3] The United States Trustee objected as well. Those objections are not at issue on appeal.

9

with the 2014 credit agreement. In Voya's view, at the time of the credit agreement, Millennium knew of the legal scrutiny it was under by the government but made "affirmative representations … which specifically indicated that there was no investigation pending that could result in a material adverse situation[,]" and Millennium further represented that it was not doing anything potentially illegal. (App. at 1309.) Voya thus asserted that it had significant legal claims against Millennium and Millennium's equity holders, that the releases of the equity holders were unlawful, and that the Bankruptcy Court lacked subject matter jurisdiction to approve them.

The Bankruptcy Court overruled Voya's objections and confirmed the plan on December 14, 2015.[4] Voya then appealed to the District Court, arguing, among other things, that the Bankruptcy Court lacked the constitutional authority to order the releases and injunctions. In response, the Appellees, all of whom are named as released parties in the confirmed plan, moved to dismiss, pressing especially that the case is equitably moot. The District Court, however, remanded the case for the Bankruptcy Court to consider whether it – the Bankruptcy Court – had constitutional authority to confirm a plan releasing Voya's claims, in light of the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011).

---

[4] A few days earlier, on December 9, 2015, Voya had filed suit against TA, MLH, and various affiliates in the District Court asserting RICO, RICO conspiracy, fraud and deceit, aiding and abetting fraud, conspiracy to commit fraud, and restitution claims. That case has been stayed pending the present litigation. *ISL Loan Tr. v. TA Assocs. Mgmt., L.P.*, No. 15-cv-1138 (D. Del.) (D.I. 11).

On remand, the Bankruptcy Court wrote a detailed and closely reasoned opinion explaining its conclusion that it had constitutional authority. It said that *Stern* is inapplicable when, as in this instance, the proceeding at issue is plan confirmation, and that, even if *Stern* did apply, the limitations imposed by that precedent would be satisfied. Voya appealed and the Appellees moved again to dismiss the matter as equitably moot.

The District Court, in an equally thoughtful opinion, affirmed the Bankruptcy Court's ruling on constitutional authority, reasoning, in relevant part, that *Stern* is inapplicable to plan confirmation proceedings. The Court then dismissed the remainder of Voya's challenges as equitably moot because the releases and related provisions were central to the reorganization plan and excising them would unravel the plan, and because it would be inequitable to allow Voya to benefit from the restructuring while also pursuing claims that MLH and TA had paid to settle. Finally, in the alternative, the District Court reasoned that, even if the Bankruptcy Court lacked constitutional authority to confirm the plan, and even if the appeal were not equitably moot, the District Court itself would affirm the confirmation order by rejecting Voya's challenges on the merits.

This timely appeal followed.

11

## II.    DISCUSSION[5]

The Parties press a number of arguments, but we need only address two: first, whether the Bankruptcy Court had constitutional authority to confirm the plan releasing and enjoining Voya's claims against MLH and TA; and second, whether this appeal, including Voya's arguments that the release provisions violate the Bankruptcy Code, is otherwise equitably moot.  Because the answer to both of those questions is yes, we will affirm.

---

[5] While the Bankruptcy Court's authority is at issue, it had jurisdiction to consider this dispute pursuant to 28 U.S.C. §§ 157, 1334.  The District Court had jurisdiction under 28 U.S.C. §§ 158(a), 1334, and we have jurisdiction under 28 U.S.C. §§ 158(d), 1291. *U.S. Tr. v. Gryphon at Stone Mansion, Inc.*, 166 F.3d 552, 553 (3d Cir. 1999); *In re Semcrude, L.P.*, 728 F.3d 314, 320 (3d Cir. 2013).  "In reviewing the Bankruptcy Court's determinations, we exercise the same standard of review as did the District Court.  We therefore review the Bankruptcy Court's legal determinations *de novo* and … its factual determinations for clear error." *In re Wettach*, 811 F.3d 99, 104 (3d Cir. 2016) (citations and internal quotation marks omitted).  "We review the [District] Court's equitable mootness determination for abuse of discretion." *In re Semcrude*, 728 F.3d at 320.

**A.** **The Bankruptcy Court Possessed the Constitutional Authority to Confirm the Plan Containing the Release Provisions**

Voya's primary argument is that, under the reasoning of *Stern v. Marshall*, the Bankruptcy Court lacked the constitutional authority to confirm a plan releasing its claims.[6] To explain why we disagree, we first consider the reach of *Stern* and then how the decision applies here.

**i.** **The Reasoning and Reach of *Stern v. Marshall***

In *Stern*, the son of a deceased oil magnate filed an adversary complaint in bankruptcy court against his stepmother for defamation and also "filed a proof of claim for the defamation action, meaning that he sought to recover damages for it from [the] bankruptcy estate."[7] 564 U.S. at 470.

---

[6] The parties also contest whether the constitutionality of the Bankruptcy Court's decision is a threshold issue that must be decided before assessing equitable mootness. Since we conclude that the Bankruptcy Court possessed constitutional authority, we need not decide whether there is a set order of operations.

[7] Both the litigation culminating in the Supreme Court's *Stern* decision, and the *Stern* decision itself, received significant public attention based on the litigants' identities. The stepmother was the late Vickie Lynn Marshall, widely known as Anna Nicole Smith. The stepson was the late E. Pierce Marshall, son of the deceased oil magnate, J. Howard Marshall II.

13

The dispute was part of a long running battle over the oil magnate's estate, and the stepmother – who was the debtor in bankruptcy – responded to the defamation claim by asserting truth as a defense and filing her own counterclaim for tortiously interfering with a gift (*i.e.,* a trust of which she would be the beneficiary) that she had expected to receive from her late husband. *Id.* The bankruptcy court granted summary judgment for the stepmother on the defamation claim and then, after a bench trial, ruled in her favor on the tortious interference counterclaim. *Id.*

The main issue before the Supreme Court was whether the bankruptcy court had the authority to adjudicate the counterclaim. The Court first decided that the bankruptcy court was statutorily authorized to do so. *Id.* at 475-78. It said that bankruptcy courts may hear and enter final judgments in what the bankruptcy code frames as "core proceedings," and the Court further ruled that the counterclaim was such a proceeding because, under 28 U.S.C. § 157(b)(2)(C), "core proceedings include 'counterclaims by the [bankruptcy] estate against persons filing claims against the estate.'" *Stern*, 564 U.S. at 475.

Nevertheless, the Supreme Court concluded that the bankruptcy court's actions violated Article III of the U.S. Constitution. *Id.* at 482. Quoting *Northern Pipeline Construction Company v. Marathon Pipe Line Company*, 458 U.S. 50, 90 (1982) (Rehnquist, J., concurring in judgment), the Court reasoned that, "[w]hen a suit is made of 'the stuff of the traditional actions at common law tried by the courts at Westminster in 1789,' and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts." *Stern*, 564

14

U.S. at 484.  The bankruptcy court had gone beyond constitutional limits when it "exercised the 'judicial Power of the United States' in purporting to resolve and enter final judgment on a state common law claim[.]"  *Id.* at 487.

The Supreme Court went on to explain that the counterclaim also not did fall within the "public rights" exception to the exercise of judicial power contemplated by Article III.  Under the public rights exception, Congress may constitutionally allocate to "legislative" – *i.e.,* non-Article III – courts the authority to resolve disputes that arise "in connection with the performance of the constitutional functions of the executive or legislative departments[.]"  *Id.* at 489 (citation omitted).  Although acknowledging that the exception is not well defined, the Court explained that it is generally limited to "cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert Government agency is deemed essential to a limited regulatory objective within the agency's authority." *Id.* at 490.  The Court had little difficulty concluding that the stepmother's counterclaim, which arose "under state common law between two private parties," and, at best, had a highly tenuous connection to federal law, did not "fall within any of the varied formulations of the public rights exception[.]"  *Id.* at 493.  But the Court made clear that it had never decided and was not then deciding whether "the restructuring of debtor-creditor relations is in fact a public right."  *Id.* at 492 n.7 (citation omitted).

The Supreme Court also rejected the stepmother's argument that her counterclaim could be decided in bankruptcy court because the stepson had filed a proof of claim.  *Id.* at 495.  In doing so, though, the Court interpreted two of its previous opinions as concluding that matters arising in the claims-

15

approval process could be adjudicated by a bankruptcy court. *Id.* at 495-97. The Court said that *Katchen v. Landy*, 382 U.S. 323 (1966), stood for the proposition that a "voidable preference claim" could be decided by a bankruptcy adjudicator "because it was not possible for the [adjudicator] to rule on the creditor's proof of claim without first resolving the voidable preference issue." *Stern,* 564 U.S. at 496. It further observed that its decision in *Langenkamp v. Culp*, 498 U.S. 42 (1990) (per curiam), was "to the same effect" and had concluded "that a preferential transfer claim can be heard in bankruptcy when the allegedly favored creditor has filed a claim, because *then* [*i.e.,* after the creditor's claim has been filed,] 'the ensuing preference action by the trustee become[s] integral to the restructuring of the debtor-creditor relationship.'" *Stern,* 564 U.S. at 497 (second alteration in original) (citation omitted). The Court distinguished that situation from the dispute before it in *Stern* because there was little overlap between the debtor-stepmother's tortious interference counterclaim and the creditor-stepson's defamation claim and "there was never any reason to believe that the process of adjudicating [the] proof of claim would necessarily resolve [the] counterclaim." *Id.* Finally, it explained that, "[i]n both *Katchen* and *Langenkamp*, … the trustee bringing the preference action was asserting a right of recovery created by federal bankruptcy law[,]" but the stepmother's counterclaim was "in no way derived from or dependent upon bankruptcy law; it [was] a state tort action that exist[ed] without regard to any bankruptcy proceeding." *Id.* at 498-99. The Court concluded by saying "that Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case[.]" *Id*. at 499. In language central to the issue before us, the Court said, "the question is whether the action at issue stems from the bankruptcy itself or

16

would necessarily be resolved in the claims allowance process." *Id.*

*Stern* makes several points that are important here. First, bankruptcy courts may violate Article III even while acting within their statutory authority in "core" matters. *Cf. Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 30-31 (2014) (describing "*Stern* claims" as "claim[s] designated for final adjudication in the bankruptcy court as a statutory matter, but prohibited from proceeding in that way as a constitutional matter"). Thus, even in cases in which a bankruptcy court exercises its "core" statutory authority, it may be necessary to consider whether that exercise of authority comports with the Constitution.

Second, a bankruptcy court is within constitutional bounds when it resolves a matter that is integral to the restructuring of the debtor-creditor relationship. The *Stern* Court relied on *Katchen* and *Langenkamp* as examples of a bankruptcy court's constitutionally appropriate adjudication of claims. Of particular note, and as quoted earlier, the Court in discussing *Langenkamp* said that it held there that a particular "claim can be heard in bankruptcy when the … creditor has filed a claim, because *then* 'the ensuing preference action by the trustee become[s] integral to the restructuring of the debtor-creditor relationship.'" *Stern*, 564 U.S. at 497 (alteration in original) (citation omitted). In other words, the Court concluded that bankruptcy courts can constitutionally decide matters arising in the claims-allowance process, and they can do that because matters arising in the claims-allowance process are integral to the restructuring of the debtor-creditor

relationship.[8]    *Id.* at 492 n.7, 497 (citations omitted). Furthermore, the Supreme Court made it clear that, for there to be constitutional authority, a matter need not stem from the bankruptcy itself. That is evident from its declaration of a two-part disjunctive test. The Court said that "the question [governing the extent to which a bankruptcy court may

---

[8] Again, and as noted on page 15 *supra*, we recognize that the Supreme Court declined to determine whether, as a general matter, "restructuring of debtor-creditor relations is in fact a public right." *Stern*, 564 U.S. at 492 n.7 (citation omitted). Thus, the Court's conclusion that bankruptcy courts can decide matters integral to the restructuring of debtor-creditor relations may not have been grounded in public rights doctrine. Indeed, Chief Justice Roberts, the author of *Stern*, has suggested as much. *Cf. Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1951 (2015) (Roberts, C.J., dissenting) ("Our precedents have also recognized an exception to the requirements of Article III for certain bankruptcy proceedings. When the Framers gathered to draft the Constitution, English statutes had long empowered nonjudicial bankruptcy 'commissioners' to collect a debtor's property, resolve claims by creditors, order the distribution of assets in the estate, and ultimately discharge the debts. This historical practice, combined with Congress's constitutional authority to enact bankruptcy laws, confirms that Congress may assign to non-Article III courts adjudications involving 'the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power.'" (internal citations omitted)). We need not identify the theory behind the Supreme Court's conclusion, however, because, regardless, "we are bound to follow [the Court's] teachings [.]" *St. Margaret Mem'l Hosp. v. NLRB*, 991 F.2d 1146, 1154 (3d Cir. 1993).

18

constitutionally exercise power] is whether the action at issue stems from the bankruptcy itself *or would necessarily be resolved in the claims allowance process*." *Id.* at 499 (emphasis added).

The third take-away from *Stern* is that, when determining whether a bankruptcy court has acted within its constitutional authority, courts should generally focus not on the category of the "core" proceeding but rather on the content of the proceeding. The *Stern* Court never said that *all* counterclaims by a debtor are beyond the reach of bankruptcy courts. Rather, it explained that those that do not "stem[] from the bankruptcy itself or would [not] necessarily be resolved in the claims allowance process" (and therefore would not be integral to the restructuring of the debtor-creditor relationship) must be decided by Article III courts. *Id.* at 497, 499. And, the Court looked to the content of the debtor's counterclaim in applying that test. It compared the factual and legal determinations necessary to resolve the tortious interference counterclaim to those necessary to resolve the defamation claim to assess whether the counterclaim would necessarily be resolved in the claims-allowance process, and it looked to the basis for the counterclaim to determine whether it stemmed from the bankruptcy itself.[9] *Id.* at 498-99.

---

[9] To be sure, the Supreme Court made clear that the claims-allowance process – a core proceeding under 28 U.S.C. § 157(b)(2)(B) – is per se integral to the restructuring of the debtor-creditor relationship and, therefore, that the category of proceeding is controlling in that context. *Stern*, 564 U.S. at 497-99. But we have no guidance as to whether any other categories of core proceedings might be treated similarly.

19

In sum, *Stern* teaches that the exercise of "core" statutory authority by a bankruptcy court can implicate the limits imposed by Article III. Such an exercise of authority is permissible if it involves a matter integral to the restructuring of the debtor-creditor relationship. And, in determining whether that is the case, we can consider the content of the "core" proceeding at issue.

### ii. The Bankruptcy Court Had Constitutional Authority Under *Stern*

Applying the foregoing principles to the case at hand leads to the conclusion that the Bankruptcy Court possessed constitutional authority to confirm the plan containing the release provisions. The Bankruptcy Court indisputably had "core" statutory authority to confirm the plan. *See* 28 U.S.C. § 157(b)(2)(L) ("Core proceedings include, but are not limited to …[,] confirmations of plans[.]"). The question is whether, looking to the content of the plan, the Bankruptcy Court was resolving a matter integral to the restructuring of the debtor-creditor relationship.[10] The only terms at issue are the provisions releasing and enjoining Voya's claims.

Those provisions were thoroughly and thoughtfully addressed by the Bankruptcy Court. It held that "[t]he injunctions and releases provisions are critical to the success of the Plan" because, "[w]ithout the releases, and the enforcement of such releases through the Plan's injunction provisions, the

---

[10] The Appellees argue that a bankruptcy court can always constitutionally confirm a plan. We have our doubts about so broad a statement but we do not need to address it to decide this case.

Released Parties [would not be] willing to make their contributions under the Plan" and, "[a]bsent those contributions, the Debtors [would] be unable to satisfy their obligations under the USA Settlement Agreements [*i.e.*, the settlement with the government] and no chapter 11 plan [would] be feasible and the Debtors would likely [have] shut down upon the revocation of their Medicare enrollment and billing privileges." (App. at 24; *see also* App. at 3596, 3598 (the Bankruptcy Court stating that "it is clear that the releases are necessary to both obtaining the funding and consummating a plan" and that "[w]ithout [MLH and TA's] contributions, there is no reorganization").) Those conclusions are well supported by the record. (App. at 1575-80, 2230, 2233-35; D. Ct. D.I. 25-2, at *233-34.) Indeed, the record makes abundantly clear that the release provisions – agreed to only after extensive, arm's length negotiations – were absolutely required to induce MLH and TA to pay the funds needed to effectuate Millennium's settlement with the government and prevent the government from revoking Millennium's Medicare billing privileges. Absent MLH and TA's payment, the company could not have paid the government, with the result that liquidation, not reorganization, would have been Millennium's sole option. Restructuring in this case was possible only because of the release provisions.

To Voya, that point is irrelevant.[11] Voya contends that *Stern* demands an Article III adjudicator decide its RICO/fraud claims because those claims do not stem from the bankruptcy itself and would not be resolved in the claims-allowance process. It asserts that the limiting phrase from *Stern*, *i.e.*,

---

[11] In fact, Voya does not even argue in its briefing that the release provisions were not integral to the restructuring.

21

"necessarily be resolved in the claims allowance process[,]" cannot be stretched to cover all matters integral to the restructuring. (Opening Br. at 31.) In that regard, Voya argues that an assertion that something is "integral to the restructuring" is really "nothing more than a description of *the claims allowance process*." (Reply Br. at 13.)

That argument fails primarily because it is not faithful to what *Stern* actually says. Had the *Stern* Court meant its "integral to the restructuring" language to be limited to the claims-allowance process, it would not have said that a bankruptcy court may decide a matter when a "creditor has filed a claim, because *then*" – adding its own emphasis to that word – "the ensuing preference action by the trustee become[s] integral to the restructuring of the debtor-creditor relationship." 564 U.S. at 497 (alteration in original). That phrasing makes clear that the reason bankruptcy courts may adjudicate matters arising in the claims-allowance process is because those matters are integral to the restructuring of debtor-creditor relations, not the other way around. And, as the Appellees correctly observe, *Stern* is not the first time that the Supreme Court has so indicated. In *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) – a case that the *Stern* Court viewed as informing its Article III jurisprudence, 564 U.S. at 499 – the Court answered first whether an action arose in the claims-allowance process and only then whether it was otherwise integral to the restructuring of debtor-creditor relations. *See Granfinanciera*, 492 U.S. at 58 ("Because petitioners here … have not filed claims against the estate, respondent's fraudulent conveyance action does not arise 'as part of the process of allowance and disallowance of claims.' Nor is that action integral to the restructuring of debtor-creditor

22

relations.").[12]  If the first step in that analysis were all that was relevant, the second step would not have been taken.

---

[12] Voya makes two additional arguments regarding the proper interpretation of *Stern*: that courts of appeals have interpreted *Stern* as centered on the claims-allowance process, and that the phrase "integral to the restructuring" is not supported by the Supreme Court's public rights jurisprudence. As to the former, we are not convinced that the out-of-circuit cases Voya cites are inconsistent with our reading of *Stern*. *Stern* on its face governed in those cases, so, unlike here, the courts had no need to extract a principle beyond *Stern*'s plain terms.  *See In re Renewable Energy Dev. Corp.*, 792 F.3d 1274, 1279 (10th Cir. 2015) (concluding that *Stern* provided "all the guidance we need to answer this appeal" because the case involved the assertion that state law legal malpractice claims against the bankruptcy trustee by clients of the trustee in his capacity as an attorney should be heard in bankruptcy court simply because the malpractice claims were "factually 'intertwined' with the bankruptcy proceedings"); *In re Fisher Island Invs., Inc.*, 778 F.3d 1172, 1192 (11th Cir. 2015) (holding that *Stern* did not apply to bar bankruptcy court adjudication of a claim where, among other things, that claim "was 'necessarily resolve[d]' by the bankruptcy court through the process of adjudicating the creditors' claims" (alteration in original) (citation omitted)); *In re Glob. Technovations Inc.*, 694 F.3d 705, 722 (6th Cir. 2012) (holding that a bankruptcy court's resolution of one issue was permissible under *Stern* because it was not possible to rule on a proof of claim without deciding the issue, and concluding that the bankruptcy court could decide a second issue that could have been necessary to ruling on a proof of claim but turned out not to be because the court did "not believe that *Stern* requires a court to determine,

23

Voya also raises a "floodgate" argument, saying that, if we allow bankruptcy courts to approve releases merely because they appear in a plan, bankruptcy courts' powers would be essentially limitless and that an "integral to the restructuring" rule would mean that bankruptcy courts could approve releases simply because reorganization financers

in advance, which facts will ultimately prove strictly necessary"); *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 564-65 (9th Cir. 2012) (holding that a bankruptcy court could not resolve a fraudulent conveyance action similar to that in *Granfinanciera* – which the *Stern* Court made clear could not have been adjudicated by a bankruptcy court – because it "need not necessarily have been resolved in the course of allowing or disallowing the claims against the…estate"); *In re Ortiz*, 665 F.3d 906, 909, 912, 914 (7th Cir. 2011) (concluding that claims could not be decided by a bankruptcy court because the case essentially matched *Stern*); *see also In re Ortiz*, 665 F.3d at 914 ("Non-Article III judges may hear cases when the claim arises 'as part of the process of allowance and disallowance of claims,' or when the claim becomes 'integral to the restructuring of the debtor-creditor relationship[.]'" (citations omitted)).  Voya also cites our decision in *Billing v. Ravin, Greenberg & Zackin, P.A.*, 22 F.3d 1242 (3d Cir. 1994), but that decision predates *Stern* and offers no insight into how best to interpret it.

Voya's second argument, that the rule we adopt today would not comport with the Supreme Court's public rights doctrine, similarly is unavailing.  As already noted (*see supra* n. 8), the precise basis for the Court's "integral to the restructuring" conclusion is unstated, and does not necessarily flow from the Court's public rights jurisprudence.

demand them, which could lead to gamesmanship. The argument is not without force. Setting too low a bar for the exercise of bankruptcy court authority could seriously undermine Article III, which is fundamental to our constitutional design.[13] It is definitely not our intention to permit any action by a bankruptcy court that could "compromise" or "chip away at the authority of the Judicial Branch[,]" *Stern*, 564 U.S. at 503, and our decision today should not be read as expanding bankruptcy court authority.

Nor should our decision today be read as permitting or encouraging the hypothetical gamesmanship that Voya fears will now ensue. Consistent with prior decisions, we are not broadly sanctioning the permissibility of nonconsensual third-party releases in bankruptcy reorganization plans. Our precedents regarding nonconsensual third-party releases and injunctions in the bankruptcy plan context set forth exacting standards that must be satisfied if such releases and injunctions are to be permitted, and suggest that courts considering such releases do so with caution. *See In re Global Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011) (en banc) (explaining that suit injunctions must be "both necessary to the

---

[13] Before the founding, "[t]he colonists had been subjected to judicial abuses at the hand of the Crown, and the Framers knew the main reasons why: because the King of Great Britain 'made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries.'" *Stern*, 564 U.S. at 483-84 (quoting The Declaration of Independence ¶ 11). Since ratification, Article III has served a crucial role in our "system of checks and balances" and "preserve[s] the integrity of judicial decisionmaking[.]" *Id.* (citation omitted).

reorganization and fair"); *In re Continental Airlines, Inc.*, 203 F.3d 203, 214 (3d Cir. 2000) ("The hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, and specific factual findings to support these conclusions[.]"). Although we are satisfied that both the Bankruptcy Court and District Court exercised appropriate – indeed, exemplary – caution and diligence in this instance, nothing in our opinion should be construed as reducing a court's obligation to approach the inclusion of nonconsensual third-party releases or injunctions in a plan of reorganization with the utmost care and to thoroughly explain the justification for any such inclusion.

In short, our holding today is specific and limited. It is that, under the particular facts of this case, the Bankruptcy Court's conclusion that the release provisions were integral to the restructuring was well-reasoned and well-supported by the record.[14] Consequently, the bankruptcy court was constitutionally authorized to confirm the plan in which those provisions appeared.[15]

---

[14] At oral argument, counsel for Voya candidly acknowledged that this is "not the usual case." https://www2.ca3.uscourts.gov/oralargument/audio/18-3210InreMilleniumLabHoldings.mp3 (Oral Arg. at 15:03-07.)

[15] The parties disagree as to whether the Bankruptcy Court's decision to confirm the plan even implicates *Stern* and Article III. Voya argues that *Stern* deprived the Bankruptcy Court of jurisdiction because the release provisions in the confirmed plan of reorganization constituted a "final judgment" on the merits of Voya's state law claims against Millennium. The Appellees respond that *Stern* is inapplicable

26

### B. The Remainder of the Appeal Is Equitably Moot

Voya next argues that the District Court erred in concluding that the remaining issues on appeal are equitably moot. Again, we disagree.

"'Equitable mootness' is a narrow doctrine by which an appellate court deems it prudent for practical reasons to forbear deciding an appeal when to grant the relief requested will undermine the finality and reliability of consummated plans of reorganization." *In re Tribune Media Co.*, 799 F.3d 272, 277 (3d Cir. 2015). At bottom, "[e]quitable mootness assures [the estate, the reorganized entity, investors, lenders, customers, and other constituents] that a plan confirmation order is reliable and that they may make financial decisions based on a reorganized entity's exit from Chapter 11 without fear that an appellate court will wipe out or interfere with their deal."[16] *Id.* at 280.

---

here, or at least readily distinguishable, because there is a distinction between a court approving the settlement of claims and adjudicating claims on the merits. According to the Appellees, the Bankruptcy Court only did the former when it approved the plan of reorganization. Our conclusion that the Bankruptcy Court's actions were constitutionally permissible assumes *Stern*'s application. Accordingly, it ultimately is irrelevant to our decision whether or not the Bankruptcy Court issued a "final judgment" on Voya's underlying claims against Millennium, and we do not address that dispute.

[16] One of the benefits of bankruptcy is its ability "to aid the unfortunate debtor by giving him a fresh start in life[.]"

An equitable mootness analysis proceeds by asking two questions: "(1) whether a confirmed plan has been substantially consummated; and (2) if so, whether granting the relief requested in the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who have justifiably relied on plan confirmation." *Id.* at 278. Voya concedes that the plan here is substantially consummated, so we focus on the second question. Answering it shows that the appeal is indeed equitably moot.

Granting Voya the relief it seeks would certainly scramble the plan. As the District Court explained, "[t]he Bankruptcy Court found [Voya's] releases were central to the Plan and, far from being clearly erroneous, [that conclusion] is

---

*Stellwagen v. Clum*, 245 U.S. 605, 617 (1918); *see In re Trump Entm't Resorts*, 810 F.3d 161, 173-74 (3d Cir. 2016) ("A Chapter 11 reorganization provides a debtor with an opportunity to reduce or extend its debts so its business can achieve longterm viability, for instance, by generating profits which will compensate creditors for some or all of any losses resulting from the bankruptcy."). Equitable mootness allows that benefit to be realized by, among other things, encouraging an end to costly and protracted litigation based on arguable blemishes in a reorganization plan. *Cf. In re Tribune*, 799 F.3d at 288-89 (Ambro, J., concurring) ("Without equitable mootness, any dissenting creditor with a plausible (or even not-so-plausible) sounding argument against plan confirmation could effectively hold up emergence from bankruptcy for years (or until such time as other constituents decide to pay the dissenter sufficient settlement consideration to drop the appeal), a most costly proposition.").

strongly supported by uncontroverted evidence in the record." (App. at 374.) The Bankruptcy Court observed, based on unrefuted evidence, that the "third-party releases, *all of them*, … [were] required to obtain the funding for this plan" (App. at 3594 (emphasis added)); that "the releases [were] necessary to … consummating a plan" (App. at 3596); and that "[w]ithout [TA and MLH's] contributions, there is no reorganization." (App. at 3598.) The release provisions, carefully crafted through extensive negotiations, served as the cornerstone of the reorganization and, hence, of Millennium's corporate survival. Notably, the confirmed plan contains a severability provision stating, "no alteration or interpretation [of the plan] can … compel the funding of Settlement Contribution if the conditions to such funding set forth in the [Restructuring Agreement] have not been satisfied" (App. at 142), and the Restructuring Agreement, in turn, says that the settlement contribution is contingent on "*a full and complete* release of … the Released Parties" and an injunction to enforce the release. (App. at 196 (emphasis added).) As the Bankruptcy Court recognized, all of the releases were essential to the plan.

But even if some subset of the release provisions could be deemed non-essential, it would not be Voya's. Voya loaned more than $100 million to Millennium through the 2014 credit agreement. Its lawsuit raises several claims based on that loan, including RICO, fraud, and restitution claims.[17] The restitution

---

[17] MLH and TA are named as defendants only as to the restitution count. But defendants on all counts are alleged to be close affiliates of MLH and TA. Importantly, defendant TA Associates Management is alleged to control TA, and MLH is alleged to be the effective alter ego of defendant James

claim alone seeks "restitution of [Voya's] funds," among other relief (App. at 2355), and presumably the other claims seek damages based on the loan amount, trebled for the RICO claims. Opening MLH, TA, and their related parties to well over $100 million in liability, above the $325 million that was negotiated and paid to settle those same claims, would completely undermine the purpose of the release provisions. And again, based on the intense, arm's length negotiations, those provisions were included because they were essential to obtaining the payment that allowed Millennium's survival. Given the centrality of the release provisions to the reorganization, excising them would undermine the fundamental basis for the parties' agreement.

Furthermore, any do-over of the plan at this time would likely be impossible and, even if it could be done, would be massively disruptive. Since the plan was confirmed, Millennium has paid the government, has "completed numerous complex restructuring and related transactions," and has distributed common stock to the lenders under the 2014 credit agreement. (App. at 6195, 6199.) In addition, "unsecured creditors [have been] paid the full amount of their allowed claims" (Supp. App. at 3); Millennium's lender and equity base has changed dramatically; the company has sold off RxAnte; and it "has entered into more than two million commercial transactions, many of which are with new counter-parties." (Supp. App. at 5.) It is inconceivable that these many post-confirmation developments could be unwound, particularly those involving the government.

---

Slattery. All counts in the complaint are directed against TA Associates Management, Slattery, or both.

In that same vein, the relief that Voya seeks would seriously harm a wide range of third parties. If the plan could somehow be unwound and Millennium put back in its pre-confirmation position, the interests and expectations of Millennium's new lenders and equity holders – who certainly invested in reliance on the reorganization – would be wholly undermined. RxAnte's acquiror would in turn have to unwind that acquisition; contracts and transactions with counterparties would be scuttled; and the status of Millennium and all of its employees and contractors would obviously be placed in severe jeopardy.

Our decision in *In re Tribune* is on point. There, a confirmed plan contained provisions settling certain claims by the estate against various parties connected with a leveraged buyout of the debtor. *In re Tribune*, 799 F.3d at 275-76. The appellant, a creditor, conceded that the plan was substantially consummated but argued that the relief it sought – reinstatement of settled causes of action – would not fatally harm the plan or third parties. *Id.* at 277, 280. We thought otherwise and said that allowing the suits barred by the settlement "would knock the props out from under the authorization for every transaction that has taken place, thus scrambling this substantially consummated plan and upsetting third parties' reliance on it." *Id.* at 281 (citations and internal quotation marks omitted). We observed that the settlement was "a central issue in the formulation of a plan of reorganization" and that "allowing the relief the appeal seeks would effectively undermine the Settlement (along with the transactions entered in reliance on it) and, as a result, recall the entire Plan for a redo." *Id.* at 280-81. It was plain that third parties would be harmed because, among other things, "returning to the drawing board would at a minimum

31

drastically diminish the value of new equity's investment[,]" which "no doubt was [made] in reliance on the Settlement[.]" *Id.* at 281. That same reasoning applies with great force in this case.[18]

---

[18] Voya tries to distinguish *In re Tribune* by arguing that the appellant there sought to scuttle the settlement provisions in their entirety, unlike here. But eliminating the release provisions as to Voya would have the same effect as eliminating the release provisions in their entirety: the plan would fall apart.

Voya also points us to several other decisions it views as demonstrating that we have "found bankruptcy appeals not to be equitably moot where, as here, a party merely seeks revival of discrete released claims that would not otherwise upset a confirmed plan." (Opening Br. at 51.) The cases it highlights, however, unlike the matter now before us, all involved release provisions that were not central to the plans at issue. *See In re Semcrude*, 728 F.3d at 324 (holding that a case was not equitably moot because, among other things, granting the requested relief "would [not] upset the [settlement] or … cause the remainder of the plan to collapse" and the amounts involved in the suit would not "destabilize the financial basis of the settlement"); *In re PWS Holding Corp.*, 228 F.3d 224, 236 (3d Cir. 2000) (rejecting an equitable mootness argument where "[t]he releases (or some of the releases) could be stricken from the plan without undoing other portions of it"); *In re Continental Airlines*, 203 F.3d at 210 (rejecting an equitable mootness challenge because, among other things, "[n]o evidence or arguments [were] presented that Plaintiffs' appeal, if successful, would necessitate the reversal or unraveling of the entire plan of reorganization").

32

Voya raises several unpersuasive arguments challenging the District Court's equitable mootness decision. In spite of all the evidence, it contends that striking the release provisions only as to it would not cause the plan to collapse. It says that the remainder of the plan would stay in place, including the release provisions as to other parties, given that the other lenders consented. According to Voya, nothing in the plan would authorize MLH and TA to demand the return of their contribution if the release provisions were stricken, and it claims that, in fact, the plan anticipates "just such a scenario and gives [MLH and TA] … the ability to access insurance coverage and/or indemnification from Debtors (capped at $3 million) for defense costs." (Opening Br. at 50.) But, as explained above, striking the release provisions as to Voya would certainly undermine the plan. That the plan provides for "insurance coverage and/or indemnification" as a contingency does not change that. As previously noted, the plan says that the settlement payment, the very payment on which Millennium's viability as a going concern depended, could not be compelled absent full and complete releases from *all* of Millennium's pre-bankruptcy lenders, including Voya.

Voya next argues that granting it relief will not disturb legitimate third-party expectations. As to that point, it declares that MLH and TA's reliance interests do not count, "both because they are relying on the Plan to obtain unlawful nonconsensual releases to which they are not legally entitled and because they are sophisticated parties who were intimately involved in constructing the Plan and fully aware of the appellate risks when they allowed it to be consummated." (Opening Br. at 53.) But, besides the circularity of its reasoning, Voya's position misses the mark, as it ignores the fact that numerous other third parties, including Millennium's

new post-bankruptcy equity holders and lenders, would be harmed significantly by any effort to unwind the plan.

Voya also raises a series of arguments claiming that it would be fair to strike the releases as to it while not returning any of MLH and TA's contribution and without requiring Voya to return any of the value it obtained by way of the reorganization.[19]  Each of those arguments is a non-starter. Voya wants all of the value of the restructuring and none of the pain.  That is a fantasy and upends the purpose of the equitable mootness doctrine, which is designed to prevent inequitable outcomes.  *Cf. In re PWS Holding Corp.*, 228 F.3d 224, 235-36 (3d Cir. 2000) ("Under the doctrine of equitable mootness, an appeal should be dismissed … *if the implementation of that relief would be inequitable*." (emphasis added)).  "Equity abhors a windfall." *US Airways, Inc. v. McCutchen*, 663 F.3d 671, 679 (3d Cir. 2011), *vacated on other grounds*, 569 U.S.

---

[19] Voya says that that course of action would not be inequitable because it did not receive any consideration for releasing its claims; that the plan gave MLH and TA the right to insist that plan consummation be delayed until all appeals were exhausted, and they instead assumed the risk of an adverse ruling; that, "prior to the bankruptcy, [MLH and TA] were willing to make the same $325 million contribution in the context of an out-of-court restructuring, even if they did not receive releases from non-consenting Lenders holding up to $50 million (subject to increase) of aggregate principal term loan balance" (Reply Br. at 9); that MLH and TA attempted to leverage Millennium's distress to obtain the release provisions; and that MLH and TA were aware at the time they obtained the release provisions that our precedents regarding such provisions were unclear.

88, 106 (2013); *Prudential Ins. Co. of Am. v. S.S. Am. Lancer*, 870 F.2d 867, 871 (2d Cir. 1989). Voya would receive a windfall – at the substantial and uncompensated expense of MLH and TA – if we were to let it avoid the release provisions without requiring it to return the value it obtained through the reorganization consummated on the basis of those release provisions and without allowing MLH and TA to recover their contribution. Voya's arguments also fail by their own terms. The question of whether Voya received consideration for the releases is a merits question, not an equitable mootness one. *See In re United Artists Theatre Co.*, 315 F.3d 217, 227 (3d Cir. 2003) (explaining that non-consensual releases must be given in exchange for fair consideration, among other things). And, regardless of formal consideration, it would still be inequitable to let Voya retain the benefits of the settlement and still have the right to sue. *See In re Tribune*, 799 F.3d at 281 ("When determining whether the case is equitably moot, we of course must assume [the appellant] will prevail on the merits because the idea of equitable mootness is that *even if* [the appellant] is correct, it would not be fair to award the relief it seeks.").

In the end, the operative question for our equitable mootness inquiry is straightforward: would granting Voya relief fatally scramble the plan and/or harm third parties. The answer is clearly yes.[20] Granting Voya's requested relief would lead to profoundly inequitable results, and the District

---

[20] Nothing in our opinion should be read to imply that review of reorganization plans involving third-party releases will always or even often be barred as equitably moot and therefore effectively unreviewable. Again, our holding today is specific and limited to the particular facts of this case.

35

Court did not abuse its discretion in concluding that the appeal was equitably moot.

**III.    CONCLUSION**

For the foregoing reasons, we will affirm the decision of the District Court.